# UNITED STATES ET AL. v. STUDENTS CHALLENGING REGULATORY AGENCY PROCEDURES (SCRAP) ET AL.

No. 72–535. Argued February 28, 1973—Decided June 18, 1973*

*Together with No. 72–562, *Aberdeen & Rockfish Railroad Co. et al.* v. *Students Challenging Regulatory Agency Procedures (SCRAP) et al.*, also on appeal from the same court.

670

STEWART, J., delivered the opinion of the Court, in which BRENNAN and BLACKMUN, JJ., joined; in Parts I and II of which DOUGLAS and MARSHALL, JJ., joined; and in Parts I and III of which BURGER, C. J., and WHITE and REHNQUIST, JJ., joined. BLACKMUN, J., filed a concurring opinion, in which BRENNAN, J., joined, *post*, p. 699. DOUGLAS, J., filed an opinion dissenting in part, *post*, p. 699. WHITE, J., filed an opinion dissenting in part, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 722. MARSHALL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 724. POWELL, J., took no part in the consideration or decision of the cases.

*Solicitor General Griswold* argued the cause for the United States et al. in No. 72–535. With him on the briefs were *Assistant Attorney General Frizzell, Edward R. Korman, Fritz R. Kahn, Betty Jo Christian,* and *James F. Tao.* *Hugh B. Cox* argued the cause for appellants in No. 72–562. With him on the briefs were *Charles A. Horsky, Michael Boudin,* and *Edward A. Kaier.*

*Peter H. Meyers* argued the cause *pro hac vice* for Students Challenging Regulatory Agency Procedures, appellee in both cases. With him on the brief was *John F. Banzhaf III. John F. Dienelt* argued the cause *pro hac vice* for Environmental Defense Fund et al., appellees in both cases. With him on the brief was *Dennis M. Flannery*.†

MR. JUSTICE STEWART delivered the opinion of the Court.

Under the Interstate Commerce Act, the initiative for rate increases remains with the railroads. But in the absence of special permission from the Interstate Commerce Commission, a railroad seeking an increase must provide at least 30 days' notice to the Commission and the public before putting the new rate into effect. 49 U. S. C. § 6 (3).[1] During that 30-day period, the Com-

---

†*Jerome J. McGrath* filed a brief for Independent Natural Gas Association of America as *amicus curiae* urging reversal.

*Edward L. Merrigan* filed a brief for National Association of Secondary Material Industries, Inc., as *amicus curiae* urging affirmance.

[1] Title 49 U. S. C. § 6 (3) provides: "No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the Commission and to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection: *Provided,* That the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions: *Provided further,* That the Commission is authorized to

mission may suspend the operation of the proposed rate for a maximum of seven months pending an investigation and decision on the lawfulness of the new rates. 49 U. S. C. § 15 (7).[2]  At the end of the seven-month

make suitable rules and regulations for the simplification of schedules of rates, fares, charges, and classifications and to permit in such rules and regulations the filing of an amendment of or change in any rate, fare, charge, or classification without filing complete schedules covering rates, fares, charges, or classifications not changed if, in its judgment, not inconsistent with the public interest."

[2] Title 49 U. S. C. § 15 (7) provides in pertinent part: "Whenever there shall be filed with the Commission any schedule stating a new . . . rate, fare, or charge, . . . the Commission shall have . . . authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, [or] charge . . . ; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, [or] charge . . . , but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, [or] charge . . . goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective.  If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, [or] charge . . . shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or

period, the carrier may put the suspended rate into effect unless the Commission has earlier completed its investigation and found the rate unlawful.[3]

Proceeding under this regulatory scheme, on December 13, 1971, substantially all of the railroads in the United States requested Commission authorization to file on 5 days' notice a 2.5% surcharge on nearly all freight rates. The railroads sought a January 1, 1972, effective date for the new rates. The surcharge was proposed as an interim emergency measure designed to produce some $246 million annually in increased revenues pending adoption of selective rate increases on a permanent basis.

As justification for the proposed surcharge, the railroads alleged increasing costs and severely inadequate revenues. In its last general revenue increase case, less than two years earlier, the Commission had found:

"[T]he financial condition of the railroad industry as a whole, and the financial status of many individual carriers by rail, must be found to be at a dangerously low level. The precipitous decline in working capital and serious loss of liquidity has reduced many carriers to a truly marginal operation. This has been most clearly demonstrated by the recent bankruptcy application of the Penn Central. We think it undeniable that a number of

charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, [or] charge . . . after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, [or] charge . . . is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible."

[3] Other statutory provisions giving suspension powers to the Commission include 49 U. S. C. §§ 316 (g), 318 (c) (Motor Carrier Act); 49 U. S. C. §§ 907 (g), (i) (Water Carrier Act); 49 U. S. C. § 1006 (e) (Freight Forwarders Act).

other roads are approaching a similar financial crisis."
*Ex parte Nos. 265/267, Increased Freight Rates,
1970 and 1971,* 339 I. C. C. 125, 173.

The railroads alleged that, since the close of that proceeding, their costs had increased by over $1 billion on an annual basis, including $305 million in increased wages, while economic indicators such as decreased working capital and increased debt obligations pointed toward an ever-worsening financial condition.[4]

In an order dated December 21, 1971, the Commission acknowledged the need, particularly of some carriers, for increased revenues, but it concluded that five days' notice and a January 1, 1972, effective date "would preclude the public from effective participation." *Ex parte No. 281, Increased Freight Rates and Charges, 1972,* 340 I. C. C. 358, 361. The Commission authorized the railroads to refile the 2.5% surcharge with not less than 30 days' notice, and an effective date no earlier than February 5, 1972.

On January 5, 1972, the railroads refiled the surcharge, to become effective on February 5, 1972. Shippers, competing carriers, and other interested persons requested the Commission to suspend the tariff for the statutory seven-month period. Various environmental groups, including Students Challenging Regulatory Agency Procedures (SCRAP) and the Environmental Defense Fund (EDF), two of the appellees here, protested that failure to suspend the surcharge would cause their members "economic,

---

[4] Figures reported to the Commission indicated that the net working capital of the Class I railroads for the 12 months ending September 30, 1971, was only $75.4 million, approximately $33.7 million less than the year-end 1970 figure. Long-term debt maturing within one year from September 30, 1971, was $43.6 million higher than on December 31, 1970. Equipment obligations at the end of 1970 were $4,448 million, or almost twice the total in 1960.

recreational and aesthetic harm." Specifically, they claimed that the rate structure would discourage the use of "recyclable" materials, and promote the use of new raw materials that compete with scrap, thereby adversely affecting the environment by encouraging unwarranted mining, lumbering, and other extractive activities. The members of these environmental groups were allegedly forced to pay more for finished products, and their use of forests and streams was allegedly impaired because of unnecessary destruction of timber and extraction of raw materials, and the accumulation of otherwise recyclable solid and liquid waste materials. The railroads replied that since this was a general rate increase, recyclable materials would not be made any less competitive relative to other commodities, and that in the past general rate increases had not discouraged the movement of scrap materials.

The Commission issued an order on February 1, 1972, shortly before the surcharge would have automatically become effective. It recognized that "the railroads have a critical need for additional revenue from their interstate freight rates and charges to offset, in part, recently incurred increased operating costs," and announced its decision not to suspend the 2.5% surcharge for the seven-month statutory period.[5] In anticipation of the proposed permanent selective increases to be filed by the railroads and to avoid further complication of the tariff rates, the Commission specified that its refusal to suspend was conditioned upon the carriers' setting an expiration date for the surcharge of no later than June 5, 1972.[6] The Commission ordered the investigation into

---

[5] The order of the ICC is unreported.

[6] The Commission also imposed as a condition on its refusal to suspend the exclusion of increased rates "on freight in trailer bodies, semi-trailers, vehicles or containers on flat cars, on export and

the railroads' rates which had been instituted by its December 21 order to be held in abeyance until the carriers requested permission to file the indicated permanent rate increases on a selective basis. With respect to the appellees' environmental arguments, the Commission found that "the involved general increase will have no significant adverse effect on the movement of traffic by railway or on the quality of the human environment within the meaning of the [National] Environmental Policy Act of 1969."

The proposed permanent selective increases, averaging 4.1%, were subsequently filed with the Commission, and various parties again requested that these proposed rates also be suspended. By order served March 6, 1972, the Commission did not grant the railroads' request to have the selective increases go into effect on April 1, 1972, as they had sought but it allowed the carriers to republish their rates to become effective on May 1, 1972, upon not less than 45 days' notice to the public. The carriers did republish the rates, and on April 24, 1972, the Commission entered an order suspending the proposed selective increase for the full seven-month period allowed by statute, or to and including November 30, 1972.[7] The investigation into the increased rates was continued. Since the selective increases were to supplant the temporary surcharge, and since they had been suspended, the Commission modified its February 1 order and authorized the railroads to eliminate the June 5 expiration date for

import traffic." Since such increases had been proposed only by the western and southern carriers and not by the eastern carriers, such increases would, in the Commission's view, have disrupted existing port relationships.

Finally, the Commission conditioned its action on the provision that the proposed surcharge would not apply to shipments originating prior to February 5, 1972, and moving under transit arrangements.

[7] The March 6 and April 24 orders of the ICC are unreported.

the surcharge and to continue collecting the surcharge until November 30, 1972.

I

On May 12, 1972, SCRAP filed the present suit against the United States and the Commission in the District Court for the District of Columbia seeking, along with other relief, a preliminary injunction to restrain enforcement of the Commission's February 1 and April 24 orders allowing the railroads to collect the 2.5% surcharge.

SCRAP stated in its amended complaint that it was "an unincorporated association formed by five law students . . . in September, 1971. Its primary purpose is to enhance the quality of the human environment for its members, and for all citizens . . . ." To establish standing to bring this suit, SCRAP repeated many of the allegations it had made before the Commission in *Ex parte 281*. It claimed that each of its members "suffered economic, recreational and aesthetic harm directly as a result of the adverse environmental impact of the railroad freight structure, as modified by the Commission's actions to date in *Ex Parte 281.*" Specifically, SCRAP alleged that each of its members was caused to pay more for finished products, that each of its members "[u]ses the forests, rivers, streams, mountains, and other natural resources surrounding the Washington Metropolitan area and at his legal residence, for camping, hiking, fishing, sightseeing, and other recreational [and] aesthetic purposes," and that these uses have been adversely affected by the increased freight rates, that each of its members breathes the air within the Washington metropolitan area and the area of his legal residence and that this air has suffered increased pollution caused by the modified rate structure, and that each member has been forced to pay increased taxes because of the sums which must be expended to dispose of otherwise reusable waste materials.

The main thrust of SCRAP's complaint was that the Commission's decisions of February 1 and April 24, insofar as they declined to suspend the 2.5% surcharge, were unlawful because the Commission had failed to include a detailed environmental impact statement as required by § 102 (2) (C) of the National Environmental Policy Act of 1969 (NEPA), 42 U. S. C. § 4332 (2) (C). NEPA requires such a statement in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment . . . ." *Ibid.*[8] SCRAP contended that because

---

[8] Section 102, 42 U. S. C. § 4332, provides in pertinent part:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

. . . . .

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President,

of its alleged adverse impact upon recycling, the Commission's action with respect to the surcharge constituted a major federal action significantly affecting the environment.

Three additional environmental groups, also appellees here, were allowed to intervene as plaintiffs, and a group of railroads, appellants here, intervened as defendants to support the 2.5% surcharge.[9] After a single district

the Council on Environmental Quality and to the public . . . and shall accompany the proposal through the existing agency review processes."

[9] The Environmental Defense Fund, National Parks and Conservation Association, and Izaak Walton League of America intervened as plaintiffs. The allegations as to standing made by each of these groups were similar to those made by SCRAP. EDF, for example, alleged as follows:

"EDF has a nationwide membership of over 32,000 persons composed of scientists, educators, lawyers and other citizens dedicated to the protection of our environment and the wise use of our natural resources. Each of EDF's members has a personal interest in the maintenance of a safe, healthful, productive environment as free from waste substances as is possible. EDF's members have contributed financially to EDF in part so that they may obtain adequate representation of their legally protected environmental interests, which representation they could not otherwise individually afford. Each of EDF's members has under § 101 (c) of NEPA, 'a responsibility to contribute to the preservation and enhancement of the environment,' which responsibility they fulfill in part by becoming a member of and contributing to EDF.

"The increased freight rates and charges in *Ex Parte 281* and the continuance of the underlying rate structure, which discriminate against movement of secondary (recyclable) materials, will cause EDF members individualized injury and adversely affect them in one or more of their activities and pastimes. Specifically, each EDF member: (i) has been or will be caused to pay more for products in the market place, made more expensive by both the non-use of recycled materials in their manufacture, and the need to use comparatively more energy in processing primary raw materials as opposed to secondary (recyclable) materials; (ii) uses the

judge had denied the defendants' motion to dismiss and SCRAP's motion for a temporary restraining order, a statutory three-judge district court was convened pursuant to 28 U. S. C. §§ 2284, 2325, to decide the motion for a preliminary injunction and the cross-motion to dismiss the complaint.

On July 10, 1972, the District Court filed an opinion, 346 F. Supp. 189, and entered an injunction prohibiting the Commission "from permitting," and the railroads "from collecting" the 2.5% surcharge "insofar as that surcharge relates to goods being transported for purposes of recycling, pending further order of this court." [10]

The court first rejected the contention that the appellees were without standing to sue because they allegedly had no more than "a general interest in seeing that the law is enforced," *id.*, at 195, and distinguished our recent decision in *Sierra Club* v. *Morton*, 405 U. S. 727, on the

---

nation's forests, rivers, streams, mountains, and other natural resources for camping, hiking, fishing, sightseeing, and other recreational and aesthetic purposes. These uses have been and will continue to be adversely affected to the extent that the freight rate structure, as modified thus far in *Ex Parte 281*, encourages destruction of virgin timber, the unnecessary extraction of nonrenewable resources, and the discharge and accumulation of otherwise recyclable materials."

[10] The court dismissed as moot that part of the complaint relating to the Commission's February 1 order because that order had expired by its own terms on June 5. Since the environmental groups have not appealed from the judgment below, we have before us for review only the District Court's action with regard to the Commission's April 24 order that allowed the surcharge to continue until November 30, 1972.

The court also concluded that since the Commission had taken no final action with respect to the 4.1% selective increase, the lawfulness of that tariff was not ripe for review. The court did, however, retain jurisdiction over the case to review the final order of the Commission.

basis that, unlike the petitioner in *Sierra Club*, the environmental groups here had alleged that their members used the forests, streams, mountains and other resources in the Washington area and that this use was disturbed by the environmental impact caused by nonuse of recyclable goods.

Second, the court found that its power to grant an injunction was not barred by our decision in *Arrow Transportation Co.* v. *Southern R. Co.*, 372 U. S. 658, 667, where we held that in enacting 49 U. S. C. § 15 (7), Congress had intentionally vested "in the Commission the sole and exclusive power to suspend" and withdrew "from the judiciary any pre-existing power to grant injunctive relief." The court reasoned that NEPA "implicitly confers authority on the federal courts to enjoin *any* federal action taken in violation of NEPA's procedural requirements" "so long as the review is confined to a determination as to whether the procedural requisites of NEPA have been followed." 346 F. Supp., at 197 and n. 11.

Finally, turning to the merits, the court concluded that the Commission's April 24 decision not to suspend the surcharge for the statutory seven-month period was a " 'major Federal action significantly affecting the quality of the human environment.' " *Id.*, at 199. On the premise that an environmental impact statement is required "whenever the action *arguably* will have an adverse environmental impact," *id.*, at 201, the court held that "the danger of an adverse impact is sufficiently real to require a statement in this case." *Ibid.*

The District Court declined to stay its injunctive order pending appeal to this Court, and on July 19, 1972, THE CHIEF JUSTICE, as Circuit Justice for the District of Columbia Circuit, denied applications to stay the preliminary injunction. 409 U. S. 1207. On December 18, 1972, we noted probable jurisdiction of the appeals filed by the

United States, the Commission, and the railroads. 409 U. S. 1073.[11]

## II

The appellants challenge the appellees' standing to sue, arguing that the allegations in the pleadings as to stand-

---

[11] While subsequent events do not bear directly on the validity of the District Court's action in granting the preliminary injunction, they do highlight the problems that hover in the background of this litigation.

On October 4, 1972, the Commission served its report and order in *Ex parte 281* approving, with some exceptions, the general increases filed by the railroads. *Increased Freight Rates and Charges, 1972*, 341 I. C. C. 290. In that report, although the Commission gave extensive consideration to environmental aspects of the rate increases, it declined to include a formal environmental impact statement because it concluded that its actions "will neither actually nor potentially significantly affect the quality of the human environment . . . ." *Id.*, at 314.

The selective increases were to become effective on October 23, 1972, but the Commission delayed until November 12 the effective date for rate increases on recyclable commodities in order to allow the submission of comments by interested parties. Upon the submission of critical comments, the Commission, in an unreported order served on November 8, reopened the rate proceeding in *Ex parte 281* for further evaluation of the rates on recyclable commodities, and ordered the proposed selective tariff increases on those commodities suspended for the full seven-month period authorized by statute—until June 10, 1973. Accordingly, with respect to recyclable commodities on which the proposed selective increase had been suspended, the Commission extended the expiration date of the 2.5% surcharge until June 10, 1973, the expiration date for the suspension of the selective increases. But the Commission acknowledged that the power to collect the surcharge on these recyclable commodities was barred by the preliminary injunction issued by the District Court in the present case and which is the subject of the present appeals. In short, the temporary 2.5% surcharge would have been in effect throughout this period on recyclable commodities but for the District Court's resilient preliminary injunction. Whether the Commission deliberately continued the surcharge beyond the time it would have been supplanted by the selective increases in order to

ing were vague, unsubstantiated, and insufficient under our recent decision in *Sierra Club* v. *Morton, supra.* The appellees respond that unlike the petitioner in *Sierra*

give the surcharge and the District Court's injunction continuing effect and thus avoid mooting this litigation, and whether the Commission acted beyond its powers under 49 U. S. C. § 15 (7) by suspending the selective increases for a second seven-month period and by treating the District Court's injunction as having continuing effect, are questions not raised here. No party now maintains that these cases are moot. Cf. *Southern Pacific Terminal Co.* v. *ICC*, 219 U. S. 498, 515.

Both sets of appellees filed motions in the District Court: SCRAP sought a preliminary injunction against the Commission's October 4 order, and EDF and the other intervening plaintiffs sought leave to file an amended and supplemental complaint and requested other relief. On January 9, 1973, the court deferred consideration of the EDF motions and denied SCRAP's request for a preliminary injunction. The court found that as a result of the Commission's November 8 order, neither the selective rate increases nor the temporary surcharge could be assessed on recyclable commodities. Consequently, the court found, no injunctive relief was justified as to those materials. While the permanent rate increase approved by the Commission in *Ex parte 281* was then being collected on shipments of all other commodities, and although the Commission had concededly failed to file an impact statement, the court concluded that "the danger of an adverse impact appears to be sufficiently speculative . . . that it would be unsound to grant preliminary relief." The court continued: "The record indicates that many railroads are in dire financial straits—some on the verge of bankruptcy—and badly need the revenues now being obtained under the Commission's rate increase. The increase amounts to some $340 million per year, and were this revenue flow halted it could not easily be recouped should it later appear that no NEPA statement was necessary." The merits of neither the Commission's October 4 order nor the District Court's January 9 decision are before us, and we therefore express no opinion on them.

On May 7, 1973, the Commission served its final environmental impact statement relating to the selective rate increases on recyclable commodities. It concluded that the proposed increases would have no significant adverse effect on the environment. Contending that the impact statement was inadequate, EDF and SCRAP sought to

*Club,* their pleadings sufficiently alleged that they were "adversely affected" or "aggrieved" within the meaning of § 10 of the Administrative Procedure Act (APA), 5 U. S. C. § 702,[12] and they point specifically to the allegations that their members used the forests, streams, mountains, and other resources in the Washington metropolitan area for camping, hiking, fishing, and sightseeing, and that this use was disturbed by the adverse environmental impact caused by the nonuse of recyclable goods brought about by a rate increase on those commodities. The District Court found these allegations sufficient to withstand a motion to dismiss. We agree.

The petitioner in *Sierra Club,* "a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations," 405 U. S., at 739, sought a declaratory judgment and an injunction to restrain federal officials from approving the creation of an extensive ski-resort development in the scenic Mineral King Valley of the Sequoia National Forest. The Sierra Club claimed standing to maintain its "public interest" lawsuit because it had " 'a special interest in the conservation and the sound maintenance of the national parks, game refuges and forests of the country . . . .' " *Id.,* at 730. We held those allegations insufficient.

---

enjoin collection of the selective rate increases. On June 7, 1973, the District Court temporarily enjoined the railroads from collecting the selective increases on recyclable commodities. On June 8, 1973, THE CHIEF JUSTICE, as Circuit Justice for the District of Columbia Circuit, stayed the District Court's injunction pending further order of this Court.

[12] Like the petitioner in *Sierra Club,* the appellees here base their standing to sue upon the APA, 5 U. S. C. § 702, which provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

Relying upon our prior decisions in *Data Processing Service v. Camp,* 397 U. S. 150, and *Barlow v. Collins,* 397 U. S. 159, we held that § 10 of the APA conferred standing to obtain judicial review of agency action only upon those who could show "that the challenged action had caused them 'injury in fact,' and where the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." 405 U. S., at 733.[13]

In interpreting "injury in fact" we made it clear that standing was not confined to those who could show "economic harm," although both *Data Processing* and *Barlow* had involved that kind of injury. Nor, we said, could the fact that many persons shared the same injury be sufficient reason to disqualify from seeking review of an agency's action any person who had in fact suffered injury. Rather, we explained: "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." *Id.,* at 734. Consequently, neither the fact that the appellees here claimed only a harm to their use and enjoyment of the natural resources of the Washington area, nor the fact that all those who use those

---

[13] As in *Sierra Club,* it is unnecessary to reach any question concerning the scope of the "zone of interests" test or its application to this case. It is undisputed that the "environmental interest" that the appellees seek to protect is within the interests to be protected by NEPA, and it is unnecessary to consider the various allegations of economic harm on which the appellees also relied in their pleadings and which the Government contends are outside the intended purposes of NEPA.

resources suffered the same harm, deprives them of standing.

In *Sierra Club,* though, we went on to stress the importance of demonstrating that the party seeking review be himself among the injured, for it is this requirement that gives a litigant a direct stake in the controversy and prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders. No such specific injury was alleged in *Sierra Club.* In that case the asserted harm "will be felt directly only by those who use Mineral King and Sequoia National Park, and for whom the aesthetic and recreational values of the area will be lessened by the highway and ski resort," *id.,* at 735, yet "[t]he Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the . . . development." *Ibid.* Here, by contrast, the appellees claimed that the specific and allegedly illegal action of the Commission would directly harm them in their use of the natural resources of the Washington Metropolitan Area.

Unlike the specific and geographically limited federal action of which the petitioner complained in *Sierra Club,* the challenged agency action in this case is applicable to substantially all of the Nation's railroads, and thus allegedly has an adverse environmental impact on all the natural resources of the country. Rather than a limited group of persons who used a picturesque valley in California, all persons who utilize the scenic resources of the country, and indeed all who breathe its air, could claim harm similar to that alleged by the environmental groups here. But we have already made it clear that standing is not to be denied simply because many people suffer the same injury. Indeed some of the cases on which we relied in *Sierra Club* demonstrated the patent fact that persons

across the Nation could be adversely affected by major governmental actions. See, *e. g., Environmental Defense Fund* v. *Hardin,* 428 F. 2d 1093, 1097 (interests of consumers affected by decision of Secretary of Agriculture refusing to suspend registration of certain pesticides containing DDT); *Reade* v. *Ewing,* 205 F. 2d 630, 631–632 (interests of consumers of oleomargarine in fair labeling of product regulated by Federal Security Administration). To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion.

But the injury alleged here is also very different from that at issue in *Sierra Club* because here the alleged injury to the environment is far less direct and perceptible. The petitioner there complained about the construction of a specific project that would directly affect the Mineral King Valley. Here, the Court was asked to follow a far more attenuated line of causation to the eventual injury of which the appellees complained—a general rate increase would allegedly cause increased use of nonrecyclable commodities as compared to recyclable goods, thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area. The railroads protest that the appellees could never prove that a general increase in rates would have this effect, and they contend that these allegations were a ploy to avoid the need to show some injury in fact.

Of course, pleadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action,

not that he can imagine circumstances in which he could be affected by the agency's action. And it is equally clear that the allegations must be true and capable of proof at trial. But we deal here simply with the pleadings in which the appellees alleged a specific and perceptible harm that distinguished them from other citizens who had not used the natural resources that were claimed to be affected.[14] If, as the railroads now assert, these allegations were in fact untrue, then the appellants should have moved for summary judgment on the standing issue and demonstrated to the District Court that the allegations were sham and raised no genuine issue of fact.[15] We cannot say on these pleadings that the ap-

---

[14] The Government urges us to limit standing to those who have been "significantly" affected by agency action. But, even if we could begin to define what such a test would mean, we think it fundamentally misconceived. "Injury in fact" reflects the statutory requirement that a person be "adversely affected" or "aggrieved," and it serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, see *Baker* v. *Carr*, 369 U. S. 186; a $5 fine and costs, see *McGowan* v. *Maryland*, 366 U. S. 420; and a $1.50 poll tax, *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663. While these cases were not dealing specifically with § 10 of the APA, we see no reason to adopt a more restrictive interpretation of "adversely affected" or "aggrieved." As Professor Davis has put it: "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." Davis, Standing: Taxpayers and Others, 35 U. Chi. L. Rev. 601, 613. See also K. Davis, Administrative Law Treatise §§ 22.09–5, 22.09–6 (Supp. 1970).

[15] The railroads object to the fact that the allegations were not more precise—that no specific "forest" was named, that there was no assertion of the existence of any lumbering camp or other extractive facility in the area. They claim that they had no way to answer such allegations which were wholly barren of specifics. But, if that

pellees could not prove their allegations which, if proved, would place them squarely among those persons injured in fact by the Commission's action, and entitled under the clear import of *Sierra Club* to seek review. The District Court was correct in denying the appellants' motion to dismiss the complaint for failure to allege sufficient standing to bring this lawsuit.

## III

We need not reach the issue whether, under conventional standards of equity, the District Court was justified in issuing a preliminary injunction, because we have concluded that the court lacked jurisdiction to enter an injunction in any event.

The District Court enjoined the Commission from "permitting," and the railroads from "collecting," the 2.5% interim surcharge on recyclable commodities. Finding that NEPA implicitly conferred authority "on the federal courts to enjoin *any* federal action taken in violation of NEPA's procedural requirements," 346 F. Supp., at 197, it concluded that our decision in *Arrow Transportation Co.* v. *Southern R. Co.*, 372 U. S. 658, did not affect judicial power to issue an injunction in the circumstances of this case. We cannot agree.

In *Arrow*, the Commission had suspended a railroad's proposed rates for the statutory seven-month period, and the railroad had voluntarily deferred the proposed rate

were really a problem, the railroads could have moved for a more definite statement, see Fed. Rule Civ. Proc. 12 (e), and certainly normal civil discovery devices were available to the railroads.

Similarly, the District Court cannot be faulted for failing to take evidence on the issue of standing. This case came before the court on motions to dismiss and for a preliminary injunction. If the railroads thought that it was necessary to take evidence, or if they believed summary judgment was appropriate, they could have moved for such relief.

for an additional five months. When the Commission had not reached a final decision within that period, the railroad announced its intent to adopt the new rates. In a suit brought to enjoin the railroad from effectuating that change, we held that the courts were without power to issue such an injunction. From the language and history of § 15 (7) of the Interstate Commerce Act, we concluded that Congress had vested exclusive power in the Commission to suspend rates pending its final decision on their lawfulness, and had deliberately extinguished judicial power to grant such relief. The factual distinctions between the present cases and *Arrow* are inconsequential.

It is true that the injunction in *Arrow* was sought after the statutory seven-month period had expired and thus represented an attempt to extend judicially the suspension period, while here the injunction was issued during the suspension period. But *Arrow* was grounded on the lack of power in the courts to grant any injunction before the Commission had finally determined the lawfulness of the rates, and that holding did not depend on the fact that the availability of the Commission's power of suspension had passed. Indeed, the federal court decisions cited and approved in *Arrow* involved instances where the courts had been asked to enjoin rates *during* the statutory seven-month period. See, *e. g.*, *M. C. Kiser Co.* v. *Central of Georgia R. Co.*, 236 F. 573, aff'd, 239 F. 718; *Freeport Sulphur Co.* v. *United States*, 199 F. Supp. 913; *Bison S. S. Corp.* v. *United States*, 182 F. Supp. 63; *Luckenbach S. S. Co.* v. *United States*, 179 F. Supp. 605, 609–610, vacated in part as moot, 364 U. S. 280; *Carlsen* v. *United States*, 107 F. Supp. 398.

Similarly, there is no significance in the fact that, unlike *Arrow*, the injunction in this litigation ran against the Commission as well as the railroads. The only

way in which the Commission could comply with the court's order would be to exercise its power of suspension and suspend the surcharge. The injunction constitutes a direct interference with the Commission's discretionary decision whether or not to suspend the rates. It would turn *Arrow* into a sheer formality and effectively amend § 15 (7) if a federal court could accomplish by injunction against the Commission what it could not accomplish by injunction directly against the railroads. And, again, the federal court decisions on which *Arrow* relied were for the most part cases in which the courts had held that they were without power to compel the Commission to grant a rate suspension. See, *e. g., Bison S. S. Corp.* v. *United States, supra; Luckenbach S. S. Co.* v. *United States, supra; Carlsen* v. *United States, supra;* cf. *Freeport Sulphur Co.* v. *United States, supra.*[16]

Thus, the only arguably significant distinction between the present litigation and *Arrow* is that here the Commission allegedly failed to comply with NEPA. However, we cannot agree with the District Court that NEPA has amended § 15 (7) *sub silentio* and created an implicit exception to *Arrow* so that judicial power to grant in-

---

[16] EDF suggests that the April 24 order of the Commission was in fact a final order finding the surcharge "just and reasonable," not simply a refusal to suspend the surcharge. But the Commission's reference to the "just and reasonable" nature of the surcharge was a preliminary assessment commonly made in suspension orders. See, *e. g.,* the suspension orders quoted in *Naph-Sol Refining Co.* v. *United States,* 269 F. Supp. 530, 531; *Oscar Mayer & Co.* v. *United States,* 268 F. Supp. 977, 978–979. It did not represent a final determination by the Commission that any particular rate was just and reasonable. Indeed the Commission made it clear in its February 1 order that the surcharge was not considered a prescribed rate within the meaning of *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co.,* 284 U. S. 370, and was subject to complaint and investigation under the Act.

junctive relief in this case has been revived.[17]  NEPA, one of the recent major federal efforts at reversing the deterioration of the country's environment, declares "that it is the continuing policy of the Federal Government . . . to use all practicable means and measures . . . in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U. S. C. § 4331.  To implement these lofty purposes, Congress imposed a number of responsibilities upon federal agencies, most notably the requirement of producing a detailed environmental impact statement for "major Federal actions significantly affecting the quality of the human environment."  42 U. S. C. § 4332 (2)(C).[18]  But

---

[17] An alternative ground for avoiding the *Arrow* decision, which was suggested but not relied on by the District Court, was that the surcharge here was an "agency-made" rate, not a "carrier-made" rate.  *Moss* v. *CAB,* 430 F. 2d 891, which was cited by the court is, however, plainly inapposite.  There the CAB suspended the rates proposed by the carriers, but suggested in their place "a complete and innovative scheme for setting all passenger rates for the continental United States."  *Id.,* at 899.  It was clear that when the carriers filed the rates suggested by the Board they would not be suspended.  "Even a cursory reading of the order makes it clear that the Board told the carriers what rates to file; it set forth a step-by-step formula requiring major changes in rate-making practices and in rates which it expected the carriers to adopt."  *Id.,* at 899–900.  Here, by contrast, the level and structure of the rates were proposed entirely by the carriers.  While the Commission suggested an expiration date for the surcharge, this was simply to make the surcharge expire when the general selective increases went into effect.  This expiration date and the other standard conditions attached to the Commission's refusal to suspend the surcharge did not, in any meaningful sense, transform the carrier-made rate into a Commission-made rate.

[18] See n. 8, *supra.*

nowhere, either in the legislative history or the statutory language, is there any indication that Congress intended to restore to the federal courts the power temporarily to suspend railroad rates, a power that had been clearly taken away by § 15 (7) of the Interstate Commerce Act.

The statutory language, in fact, indicates that NEPA was not intended to repeal by implication any other statute. Thus, 42 U. S. C. § 4335 specifies that "[t]he policies and goals set forth in [NEPA] are supplementary to those set forth in existing authorizations of Federal agencies," and 42 U. S. C. § 4334 instructs that the Act "shall [not] in any way affect the specific statutory obligations of any Federal agency . . . ." Rather than providing for any wholesale overruling of prior law, NEPA requires all federal agencies to review their "present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of [NEPA] and shall propose to the President . . . such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in [NEPA]." 42 U. S. C. § 4333. It would be anomalous if Congress had provided at one and the same time that federal agencies, which have the primary responsibility for the implementation of NEPA,[19] must comply with present law and ask for any necessary new legislation, but that the courts may simply ignore what

---

[19] See *Greene County Planning Board* v. *FPC*, 455 F. 2d 412, 420; *Calvert Cliffs' Coordinating Comm.* v. *Atomic Energy Comm'n*, 146 U. S. App. D. C. 33, 43, 449 F. 2d 1109, 1119; *City of New York* v. *United States*, 337 F. Supp. 150, 160; *Cohen* v. *Price Comm'n*, 337 F. Supp. 1236, 1241.

we described in *Arrow* as "a clear congressional purpose to oust judicial power . . . ." 372 U. S., at 671 n. 22.[20]

The District Court pointed to nothing either in the language or history of NEPA that suggests a restoration of previously eliminated judicial power. While it relied primarily on the decisions of the Court of Appeals for the District of Columbia Circuit in *Calvert Cliffs' Coordinating Comm.* v. *Atomic Energy Comm'n,* 146 U. S. App. D. C. 33, 449 F. 2d 1109, and *Committee for Nuclear Responsibility, Inc.* v. *Seaborg,* 149 U. S. App. D. C. 380, 463 F. 2d 783, neither case supports an injunction under the circumstances of this case. *Calvert Cliffs'* held that a federal court had power to review rules promulgated by the Atomic Energy Commission, and there the court ordered further consideration of the rules on the ground that there had not been compliance with NEPA. In *Committee for Nuclear Responsibility* it was held that federal courts had jurisdiction to consider whether an executive decision to conduct a nuclear test had satisfied the procedural re-

---

[20] The argument that NEPA implicitly restored to the courts the injunctive power that § 15 (7) had divested is similar to a contention rejected in *Arrow* itself. There the petitioners claimed that congressional adoption of the National Transportation Policy, 54 Stat. 899, had implicitly altered § 15 (7). They claimed that the proposed new railroad rates would drive the barge lines out of existence, contrary to the congressional declaration of concern for the protection of water carriers threatened by rail competition. The Court concluded that "nothing in the National Transportation Policy, enacted many years after . . . § 15 (7), indicates that Congress intended to revive a judicial power which . . . was extinguished when the suspension power was vested in the Commission." *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658, 673. In addition, the Court noted that, as is also true with NEPA, the mandate was directed not to the courts but to the Commission. There is nothing about NEPA that makes it any more amenable for finding an implicit amendment of § 15 (7), than the National Transportation Policy was.

quirements of NEPA. The question here, however, is not whether there is general judicial power to determine if an agency has complied with NEPA, and to grant equitable relief if it has not, cf. *Arrow Transportation Co.* v. *Southern R. Co., supra,* at 671 n. 22; *Scripps-Howard Radio, Inc.* v. *FCC,* 316 U. S. 4, but rather whether in a specific context NEPA *sub silentio* revived judicial power that had been explicitly eliminated by Congress. *Calvert Cliffs'* and *Committee for Nuclear Responsibility* have nothing to say on this issue, for neither was concerned with a specific statute that restricts the power of the federal courts to grant injunctions.[21]

Our conclusion that the District Court lacked the power to grant the present injunction is confirmed by the fact that each of the policies that we identified in *Arrow* as the basis for § 15 (7) would be substantially undermined if the courts were found to have suspension powers simply because noncompliance with NEPA was alleged.

First, *Arrow* found that the Commission had been granted exclusive suspension powers in order to avoid the diverse results that had previously been reached by the courts. District courts had differed as to the existence and scope of any power to grant interim relief, with the consequence that the uniformity of rates had been jeopardized, and different shippers, carriers, and areas of the country had been subjected to disparate treatment. Similarly, since a suit to enjoin a national rate increase on NEPA grounds could be brought in any federal district court in the country, see 28 U. S. C. §§ 2284, 2321–2325, the result might easily be that the courts would

---

[21] Indeed *Calvert Cliffs'* indicated that the requirements of § 102 of NEPA, see n. 8, *supra,* did not have to be complied with, if such compliance was precluded by another statutory provision. 146 U. S. App. D. C., at 39, 449 F. 2d, at 1115. And *Committee for Nuclear Responsibility,* in another context, endorsed a principle, equally applicable here, that "repeal by implication is disfavored." 149 U. S. App. D. C. 380, 382, 463 F. 2d 783, 785.

"[reach] diverse results, . . . [engendering] confusion and [producing] competitive inequities." 372 U. S., at 663. In short, a rate increase allowed in New York might be disallowed in New Jersey.

Second, we stressed in *Arrow* that § 15 (7) represents a careful accommodation of the various interests involved. The suspension period was limited as to time to prevent excessive harm to the carriers, for the revenues lost during that period could not be recouped from the shippers. On the other hand, Congress was aware that if the Commission did not act within the suspension period, then the new rates would automatically go into effect and the shippers would have to pay increased rates that might eventually be found unlawful. To mitigate this loss, Congress authorized the Commission to require the carriers to keep detailed accounts and eventually to repay the increased rates if found unlawful. To allow judicial suspension for noncompliance with NEPA, would disturb this careful balance of interests. A railroad may depend for its very financial life on an increased rate, and the rate may be perfectly just and reasonable. Granting an injunction against that rate based on the Commission's alleged noncompliance with NEPA, although the Commission had determined not to suspend the rate, would deprive the railroad of vitally needed revenues and result in an unjustified windfall to shippers.

Finally, we found in *Arrow* that any survival of a judicial power to grant interim injunctive relief would represent an undesirable interference with the orderly exercise of the Commission's power of suspension. Similarly, to grant an injunction in the present context, even though not based upon a substantive consideration of the rates, would directly interfere with the Commission's decision as to *when* the rates were to go into effect, and would ignore our conclusion in *Arrow* that "Congress meant to foreclose a judicial power to interfere

with the *timing* of rate changes which would be out of harmony with the uniformity of rate *levels* fostered by the doctrine of primary jurisdiction." 372 U. S., at 668. As the Court of Appeals for the Second Circuit explained in *Port of New York Authority* v. *United States,* 451 F. 2d 783, 788, where, on the basis of alleged noncompliance with NEPA, an injunction was sought against a Commission order refusing to suspend rates:

> "The basis of the decision in *Arrow*—that to permit judicial interference with the Commission's suspension procedures would invite the very disruption in the orderly review of the lawfulness of proposed tariffs that Congress meant to preclude—applies with equal force to the issue now before us."

Accordingly, because the District Court granted a preliminary injunction suspending railroad rates when it lacked the power to do so,[22] its judgment must be re-

---

[22] In view of our conclusion that there was no power to grant the preliminary injunction, it is unnecessary for us to reach the other questions posed by the parties. For example, the Government and the railroads urge that, because of the pressures of time, an environmental impact statement is not required at the suspension stage of a rate proceeding, and, in any event, a decision by the Commission whether or not to suspend rates is not subject to judicial review. See *Port of New York Authority* v. *United States,* 451 F. 2d 783; *Oscar Mayer & Co.* v. *United States,* 268 F. Supp. 977; *M. C. Kiser Co.* v. *Central of Georgia R. Co.,* 236 F. 573; *Freeport Sulphur Co.* v. *United States,* 199 F. Supp. 913; *Luckenbach S. S. Co.* v. *United States,* 179 F. Supp. 605; *Carlsen* v. *United States,* 107 F. Supp. 398. The appellees in turn contend that some compliance with NEPA is possible at the suspension stage, and that such compliance is required if the statute is to be enforced "to the fullest extent possible." See 42 U. S. C. § 4332. And they urge that there is, or should be, an exception to the general principle of nonreviewability of suspension decisions for those cases where the Commission has acted beyond its statutory authority, or in violation of a clear statutory command or a procedural requirement, a standard that the appellees view as broad enough to en-

versed and the cases remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN joins, concurring.

I join the Court's judgment and its opinion, but because of the presence of the first sentence of Part III of the opinion, and to avoid any misunderstanding as to my posture, I add a few words.

For the reasons stated in my dissenting opinion in *Sierra Club* v. *Morton,* 405 U. S. 727, 755 (1972), I would hold that the appellees here have standing to maintain this action based on their allegations of harm to the environment resulting from the Commission's order of April 24, 1972. And, in evaluating whether injunctive relief is warranted, I would not require that the appellees, in their individual capacities, prove that they in fact were injured. Rather, I would require only that appellees, as responsible and sincere representatives of environmental interests, show that the environment would be injured in fact and that such injury would be irreparable and substantial.

MR. JUSTICE DOUGLAS, dissenting in part.

I

These cases present important environmental problems. They concern ratemaking for the shipment of

---

compass alleged noncompliance with NEPA. See *Naph-Sol Refining Co.* v. *United States,* 269 F. Supp. 530, 532; *Oscar Mayer & Co.* v. *United States, supra,* at 982 (Doyle, J., concurring); *Long Island R. Co.* v. *United States,* 193 F. Supp. 795. We express no view on any of these issues.

litter for recycling. Paper, glass, and metals are the main items in today's garbage.[1] As indicated by the Bureau of Mines in Appendix I to this opinion, America's method of disposing of garbage is either to use it for landfill or to put it first through incinerators and then to bury the residue. Sorting and recycling have several environmental impacts: (1) reduction in the use of incinerators lessens air pollution; (2) establishing or encouraging removal of litter from the landscape; (3) recycling saves both renewable and nonrenewable resources. As respects the last, the tons of paper that are recycled, rather than burned, can be translated into the number of standing trees that need not be cut for pulp the next year; the metals recycled protect our remaining nonrenewable supplies of ore, and so on.

Rates fixed so as to encourage vast shipments of litter are, therefore, perhaps the most immediate and dramatic illustration of a policy which will encourage protection

---

[1] In a Bureau of Mines' survey, it was established that metals and glass account for approximately 75 percent of the weight of the residues in municipal incinerator waste. Economics of Recycling Metals and Minerals from Urban Refuse, Bureau of Mines Technical Progress Report No. 33, p. 2 (Apr. 1971). From these materials, if recycled, familiar products such as bottles, newspapers, iron ingots, paper pulp, fuel oil, and methane gas can be manufactured. In addition, new products are being developed, such as glassphalt for street paving, insulation, glass wool, and glass bricks, in various colors that meet specifications for "severe weather" facing brick. *Id.*, at 7.

This project was launched under the Resource Recovery Act of 1970, 84 Stat. 1227, 42 U. S. C. § 3251 *et seq.*, under which the Secretary of HEW was authorized to provide technical and financial assistance in planning and developing resource recovery and solid waste disposal programs.

For a detailed account of a Resource Recovery Mill see Ross, How to Succeed in Recycling, Environmental Quality Magazine, June 1973, p. 51.

of the environment against several erosive conditions.[2] I would, therefore, affirm the eminently responsible decision of the District Court. 346 F. Supp. 189.

The National Environmental Policy Act of 1969, 83 Stat. 852, 42 U. S. C. § 4321 *et seq.,* declares a congressional policy

> "which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U. S. C. § 4321.

That broad policy is further expounded in § 4331 (b) to include, *inter alia,* the objective that "the Nation may . . . (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings . . . and (6) enhance the quality of renewable resources and . . . depletable resources."

---

[2] The necessity of reasonable transportation rates is even more apparent when it is realized that the volume of residue which is processed at a major recycling plant is between 250 and 1,000 tons per day. (Economics of Recycling Metals and Minerals from Urban Refuse, *supra,* n. 1, at 1.) Massive bulk transportation is therefore essential to these plant operations.

The problem is even more critical in urban areas where there is a high concentration of solid waste being generated and transportation to outlying recycling plants is a major cost factor. In 1968 a national survey found that an average of 8.2 pounds of waste per capita was collected daily in urban areas; this figure has now risen to 9 pounds. If present trends continue, this figure could be as high as 12 pounds in another 10 years. In our urban areas as a whole, the solid waste generated is fast approaching a ton a year for each man, woman, and child. Kramer, Energy Conservation and Waste Recycling, Science and Public Affairs 13, 17 (Apr. 1973).

The Government urges that appellees do not have standing to challenge the administrative determination of railroad freight rate increases. SCRAP alleged in its amended complaint that its members suffered environmental and economic injury as a result of the alleged increase, because the increase diminished the total amount of waste recycling in the United States, and made those products, which were in fact manufactured from the waste materials after the rate increase, more expensive in the marketplace. In addition, SCRAP alleged that each of its members in fact used the "forests, rivers, streams, mountains, and other natural resources . . ." for recreational purposes, and these uses were adversely affected because the Commission's rate increases discourage the reuse of recyclable commodities, such as bottles and cans, and encourage the depletion of natural resources.

In *Sierra Club* v. *Morton,* 405 U. S. 727, 734, this Court stated that, "We do not question that [environmental] harm may amount to an 'injury in fact' sufficient to lay the basis for standing under . . . the APA [5 U. S. C. § 702]. Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." The members of SCRAP have clearly alleged an "injury in fact" to the environment and to their own personal continued use of it.

"There is nothing unusual or novel in granting the consuming public standing to challenge administrative actions." *Office of Communication of United Church of Christ* v. *FCC,* 123 U. S. App. D. C. 328, 359 F. 2d 994. This Court has indicated that where "statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action." *Data Processing Service* v. *Camp,* 397 U. S. 150, 154.

Littering is a commonplace phenomenon that affects every person, almost everywhere. From reports and writings we know that littering defaces mountain trails, alpine meadows, and even our highest peaks. Those in the valleys are often almost inundated with litter. Where a river is polluted and a person is dependent on it for drinking water, I suppose there would not be the slightest doubt that he would have standing in court to present his claim. I also suppose there is not the slightest doubt that where smog settles on a city, any person who must breathe that air or feel the sulphuric acid forming in his eyes, would have standing in court to present his claim. I think it is equally obvious that any resident of an area whose paths are strewn with litter, whose parks, or picnic grounds are defaced by it has standing to tender his complaint to the court. *Sierra Club* v. *Morton, supra,* would seem to cover this case, for littering abetted by the failure to recycle would clearly seem to implicate residents to whom "the aesthetic and recreational vaues of the area" are important. *Id.,* at 735. For the reasons stated in my opinion in *Sierra Club* v. *Morton, supra,* I agree with the Court that appellees have standing, but like MR. JUSTICE BLACKMUN, I would not require appellees, in their individual capacity, to prove injury in fact. As MR. JUSTICE BLACKMUN states, it should be sufficient if appellees, "as responsible and sincere representatives of environmental interests, show that the environment would be injured in fact . . . ."

## II

The Council on Environmental Quality (CEQ), created in the Executive Office of the President, 42 U. S. C. § 4342, estimated in 1969 that this Nation produced more than 4.3 billion tons of solid refuse, including about 30 million tons of paper, 30 million tons of industrial fly ash, 15 million tons of scrap metal, 4 million tons of

plastics, 100 million automobile tires, 30 billion bottles, 60 billion cans, and millions of discarded automobiles and appliances. First Annual Report of CEQ, Aug. 1970, pp. 107–113. It reported that while most of the secondary material could be reused as a replacement for virgin material, only a small fraction was recycled. *Ibid.* One of the reasons for the absence of recycling was the high cost both of collection of the material and the transportation costs. *Ibid.*

As noted, one of the purposes of the Act was to "enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources." 42 U. S. C. § 4331 (b)(6). On October 9, 1970, Chairman Russell Train of CEQ wrote the Interstate Commerce Commission as follows:

> "The Council on Environmental Quality is deeply concerned with all facets of environmental quality. Solid waste disposal is one important aspect of the total pollution problem, and recycling is a new and desirable alternative to solid waste disposal which the Council strongly supports. The degree to which this technique will be used depends almost entirely on economics. Transportation costs, to the degree they increase secondary or scrap materials costs compared to the raw materials with which they compete, act as a disincentive to recycling. The Council believes that several rail haul costs biases currently exist and would like to discuss these cases with you. . . . In general, across-the-board percentage increases only widen existing price biases against secondary materials. Also, these increases raise the costs of doing business which can hinder the salvage and reclamation industry.
>
> "In light of the President's concern with environmental quality, the growing problems of solid waste

and the importance of recycling to alleviating them, I would like to express the Council's hope that the Interstate Commerce Commission's actions on the key issue of scrap material transportation rates will be consistent with the Nation's environmental quality goals." App. 68.

In December 1971 substantially all the railroads filed with the Commission a request to impose a 2.5% surcharge on virtually all freight. The procedural details which followed are not presently material. Suffice it to say that shippers of recyclable materials submitted verified statements in support of their view that rate increases would intensify the disincentives to shipment and use of recyclable materials. Thus the Institute for Scrap Iron and Steel submitted a study showing:

"(1) Present scrap markets are retarded because of transport rates which encourage the usage of iron ore. (2) Future scrap markets are being affected because new investment that would logically be directed to scrap-intensive steelmaking is diverted because of the existing freight rate structure to ore-intensive steelmaking. (3) Iron ore (a limited domestic natural resource) is being exploited when it can and should be conserved. (4) Some scrap iron that should be recycled is unable to move, thus the environment is despoiled by unnecessary accumulations of solid metallic waste." T. Barnes, Impact of Railroad Freight Rates on the Recycling of Ferrous Scrap (Jan. 14, 1972).

The Commission instituted a proceeding concerning the guidelines which environmental impact statements required under the Act should follow. 339 I. C. C. 508. A spokesman for the eastern railroads filed an impact statement which said that "any possible adverse environmental impact in the form of reduced movements of com-

modities by rail will come only if we fail to provide adequate and efficient service" and that the need of the railroads to that end was for increased revenues. Appellees filed a protest and a request for a suspension of the proposed surcharge alleging that the present railroad rate structure discourages the movement of "recyclable" goods and that the surcharge would further discourage recycling.

The Commission, allowing the surcharge for a limited period, found that it would "have no significant adverse effect in the movement of traffic by railway or on the quality of the human environment" within the meaning of the 1969 Act. See 340 I. C. C. 358; 341 I. C. C. 287. Chairman Train of CEQ protested to the Commission on October 30, 1972:

> "It is understandable that difficulties will be encountered in quantifying the environmental consequences of an incremental freight rate increase on recyclable materials. In our view, however, these consequences must be assessed in the light of the rate disparity between secondary and primary materials that gives rise to the problem in the first place. This disparity is a matter of an entirely different magnitude, calling for a thorough environmental assessment as a precondition to determining whether subsequent incremental increases require additional environmental impact statements. . . . Clearly at some point increases which might be individually 'insignificant' become cumulatively 'significant.' In addition, the claim that freight rates on recycled products must be increased to respond to 'emergency' revenue needs pending completion of the required, overall environmental evaluation, loses much of its force as months turn into years and the basic investigation remains uncompleted. Finally, even the 'emergency' argument itself, however legitimate, in

no way forecloses the consideration of alternatives which would both meet revenue needs and at the same time avoid further potential environmental damage while the basic rate structure issue is being resolved. Alternatives of this sort were, in fact, suggested in the partial dissenting opinions of Commissioners Brown and Deason (who would have denied approval of increases for recyclable commodities), with no indication in the Commission's majority report that such measures would not have been sufficient to meet the revenue needs relied on to justify the rate increases. . . . In summary, the Council feels that the basic environmental issues related to the existing freight rate structure and changes thereto, must be evaluated in a logical, analytical and timely fashion in compliance with the requirements of the National Environmental Policy Act. The Commission's actions to date appear to be inconsistent with the objectives of NEPA, and the analyses undertaken to date by the Commission appear to offer an inadequate basis from which to draw conclusions concerning the impact of freight rates on recycling and enviromental quality. Our staff is available to discuss the NEPA procedural issues as well as to assist in structuring the analytical work required to assess adequately the environmental impact of freight rates." [3]   App. 87–89.

---

[3] In his report before the Senate, Senator Jackson, one of the three legislators most responsible for NEPA, stated: "To insure that the policies and goals defined in this act are infused into the ongoing programs and actions of the Federal Government, the act also establishes some important 'action-forcing' procedures. Section 102 authorizes and directs all Federal agencies, to the fullest extent possible, to administer their existing laws, regulations, and policies in conformance with the policies set forth in this act. It also directs all agencies to assure consideration of the environmental impact of their actions in decision-making. It requires agencies which propose actions to

The three-judge District Court held that the conclusion of the Commission that the rate increase would have "no significant adverse effect" on the environment within the meaning of EPA was "transparent" and "a ruse." 346 F. Supp., at 200–201. This leads to an analysis of § 102 of NEPA.[4]

That section is directed to "all agencies of the Federal Government," which of course includes the Interstate Commerce Commission. It directs the agency to interpret and administer "the policies, regulations, and public laws" which it administers "to the fullest extent possible" in accordance with the policies of EPA. It directs the agency[5] to include in "major Federal actions significantly affecting the quality of the human environment" a detailed statement "by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship

consult with appropriate Federal and State agencies having jurisdiction or expertise in environmental matters and to include any comments made by those agencies which outline the environmental considerations involved with such proposals.

"Taken together, the provisions of section 102 directs [sic] any Federal agency which takes action that it must take into account environmental management and environmental quality considerations." 115 Cong. Rec. 40416 (1969).

[4] The totality of § 102 is so important to this litigation that I have set it forth in Appendix II to this dissent.

[5] Senator Jackson was reported as saying:

"We expected Section 102 of the act which requires environmental impact statements and analysis of alternatives for all major federal actions significantly affecting the quality of the human environment to force the agencies to move. . . . We did not anticipate that it would be private parties through the courts that would force the compliance. This is what has made it work." Cahn, Can Federal Law Help Citizens Save Nature's Fragile Beauty?, Christian Science Monitor 12 (Feb. 28, 1973).

between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, . . . and shall accompany the proposal through the existing agency review processes." 83 Stat. 853.

Rates affecting litter, like rates affecting other commodities, obviously are relevant to the ease and expedition with which it will be transported. To get the litter to appropriate recycling plants in the quantities needed to protect our fast depleting forests and our non-renewable resources [6] and to relieve our landscape of the litter that plagues us may need special incentive rates.

The report, H. R. Conf. Rep. No. 91-765, makes clear that no agency of the Federal Government is exempt and that each should comply unless existing law applicable to the agency "expressly prohibits or makes full compli-

---

[6] Waldo E. Smith, of the American Geophysical Union, recently stated: "The total supply of most metals is sharply limited; even now we must dig deeper, go farther, and use lower grade ores. No optimism is justified here. The supply can be extended substantially by intelligent recycling, which should be an important by-product of our cleaning up to maintain a clean environment." Resources and Long-Forecasts, Science and Public Affairs 21, 22 (May 1973).

ance with one of the directives impossible." The report states:

> "The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in such subparagraphs (A) through (H) unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible. If such is found to be the case, then compliance with the particular directive is not immediately required. However, as to other activities of that agency, compliance is required. Thus, it is the intent of the conferees that the provision 'to the fullest extent possible' shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in section 102. Rather, the language in section 102 is intended to assure that all agencies of the Federal Government shall comply with the directives set out in said section 'to the fullest extent possible' under their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance." *Id.,* at 9–10.

The District Court, acting responsibly in light of the broad and clear-cut policy of the Act concluded that it sets a " 'high standard' " for federal agencies, that there is no " 'escape hatch for footdragging agencies,' " that the Act does not make the preparation and use of these impact statements " 'discretionary,' " that Congress did not intend that this Act be " 'a paper tiger.' " 346 F. Supp., at 199.[7]

---

[7] When Congress desires exceptions to be made to the impact statement requirement under the NEPA, express exemption is provided. For example, Pub. Law 92–307, 86 Stat. 191, pro-

*Arrow Transportation Co.* v. *Southern R. Co.,* 372
U. S. 658, does not preclude review here.   In *Arrow* there
were rates which the Commission had the power to sus-
pend but had not suspended.   The power of suspension
was entrusted to the Commission only; and we held that
the courts should not intrude when the Commission has
not acted.   Here the Commission has acted; it has found
that "the increases here proposed are just and reasonable,
that the revenues derived therefrom will result in earnings

---

vides that the Atomic Energy Commission can grant a tempo-
rary operating license for a nuclear power reactor without the
completion of an environmental impact statement, if the applica-
tion for the operating license was filed before September 9, 1971,
and the Commission holds a hearing which leads to the findings,
among others, that the operation of the facility during the period
of the temporary operating license in accordance with its terms and
conditions will provide adequate protection of the environment dur-
ing that period and that the operation of the facility is essential
toward insuring the power-generating capacity of a utility system.
The Commission is empowered to impose such terms and conditions
as it deems necessary, and its decision is subject to judicial review.

Some federal agencies are taking affirmative action to promote the
purposes of § 105.   Thus the Securities and Exchange Commission
recently adopted amendments to its registration and reporting forms
to require more meaningful disclosure of certain items pertaining to
the effect on the issuer's business of compliance with federal, state,
and local laws and regulations relating to the protection of the en-
vironment.   The amendments will require as a part of the descrip-
tion of the issuer's business, appropriate disclosures with respect to
the material effects which compliance with environmental laws and
regulations may have upon the capital expenditures, earnings, and
competitive position of the issuer and its subsidiaries.   Other amend-
ments describe the extent to which litigation disclosures should con-
tain specific descriptions of environmental proceedings.   Securities
and Exchange Comm'n Release (Securities Act Rel. No. 5386,
Apr. 20, 1973).   See *Scientists' Institute* v. *AEC,* 156 U. S. App. D. C.
395, 481 F. 2d 1079, holding that an impact statement must be
filed for the Atomic Energy Commission's liquid metal fast breeder
reactor program.

and rates of return . . . not in excess of that required to enable" the carriers "to render adequate and efficient transportation at the lowest cost consistent with the furnishing of such service." *Ex parte 281,* Order of Feb. 1, 1972 (unreported). The Commission said it was not prescribing rates, though it attached conditions on approval of the rates without suspension. It made clear it would suspend the new rates if the conditions were not added. As stated by the three-judge court: "A suspension decision which effectively blackmails the carriers into submitting agency-authored rates is functionally indistinguishable from an agency order setting those rates." 346 F. Supp., at 197.

Moreover, as the three-judge court held and as Judge Friendly observed in *City of New York* v. *United States,* 337 F. Supp. 150, 164, "NEPA is a new and unusual statute imposing substantive duties which overlie those imposed on an agency by the statute or statutes for which it has jurisdictional responsibility."

The Court today greatly weakens NEPA in a crucially important segment of the federal environmental field. Movement of litter to recycling plants[8] is critically important, as Chairman Train makes abundantly clear. The alternative is to leave it underfoot or to cart it off as garbage to incinerators that pollute the air or to landfills that are getting more and more difficult to find.[9] We know that recycled paper, recycled copper, recycled

---

[8] Senator Jackson recently was reported as saying about these impact statements:

"We also should be able to get generic environmental impact statements—updated every six months or so—for energy policy, transportation policy, and other major policy decisions." *Cahn, supra,* n. 5.

[9] Most of the Nation's waste is relocated into dumps with only approximately 10% to 15% finding its way into sanitary landfills. Kramer, *supra,* n. 2, at 17.

iron, and recycled glass are practical. The Federal Bureau of Mines in its pilot plant at Edmonston, Maryland, boasts that "urban ore," as it calls this debris, costs about $3 a ton and recycled is worth $11 a ton. We know that we deal here with nonrenewable resources. We are told that recycling paper saves thousands of acres of trees a year.[10]

Under the Act, the appraisal by the Council on Environmental Quality of which Russell Train is the chairman is a weighty one, for under § 204 of the Act it has the responsibility "to appraise the various programs and activities of the Federal Government" in light of the policy of the Act and "to develop and recommend . . . national policies to foster and promote the improvement of environmental quality." 83 Stat. 855; 42 U. S. C. §§ 4344 (3), (4). CEQ is, in other words, the expert ombudsman in the environmental area.

---

[10] Congressman Dingell, another main sponsor of NEPA, recently was reported as saying:

"The success of the environmental impact statements is not so much that they were used as we intended they should, but that citizens have been able to use the process as a [way] to get into courts. . . . Some agencies are complying poorly. They decide what they are going to do and then write an environmental impact statement to support the decision. That is not what Congress had in mind. I am fearful that we are breeding a race of impact statement writers who put all the right words down but don't really get environmental concerns involved in the decision-making process. The impact statement itself is not important. The important thing is that proper judgments are made reflecting environmental considerations in the decision-making process. The impact statement should be a discipline for this and also a process by which the public can be informed and brought into the decision-making process." *Cahn, supra,* n. 5.

For a recent account of impact statements on transportation problems see Robert Cahn (former member of CEQ), Environmentalists Wary of Transport Trend, Christian Science Monitor 12 (Feb. 28, 1973).

The apparent tendency among federal agencies, Congressman Dingell says,[11] is to decide first what they want to do and then prepare an impact statement as an *apologia* for what they have done. That puts the cart before the horse. That is what the Commission did here. But that is to adopt "an excessively narrow construction" of its statutory power "to avoid compliance" with the new environmental standards—all as condemned in the Conference report, *supra,* at 10. That is to say, environmental considerations are, so far as possible, to shape all agency policies and decisions.

These cases are, indeed, Exhibit A of the current practice of federal agencies to undermine the policy announced by Congress in NEPA. Rail rates were long discriminatory in retarding the industrial development of the South. *New York* v. *United States,* 331 U. S. 284. The present rates are arguably discriminatory against the removal of the litter which is about to engulf us. The wisdom of Chairman Train, rather than the technical maneuvers of the Commission, should be our guide.

I would affirm the judgment of the District Court.

## APPENDIX I TO OPINION OF DOUGLAS, J., DISSENTING IN PART

The Bureau of Mines had at Edmonston, Maryland, for several years an incinerator residue processing plant on the basis of which Lowell, Massachusetts, instituted its Resource Recovery Project.

The Edmonston project is now engaged in recycling of raw waste and the following is the Bureau's description of the nature and scope of that project.

---

[11] See n. 10, *supra.*

# FACT SHEET

Edmonston (Md.) Solid Waste Recycling Project
Bureau of Mines

## DEPARTMENT OF THE INTERIOR

An important part of the solid waste utilization research carried on by the Bureau of Mines is to develop methods and processes for recycling mineral materials present in urban refuse. Engineers from the Bureau's College Park (Md.) Metallurgy Research Center operate a pilot plant at Edmonston, Maryland, where they reclaim ferrous metals, nonferrous metals, glass, plastics, and paper from raw unburned refuse. The following facts are pertinent to the research underway at the Edmonston pilot plant.

xxx—100 pounds of typical municipal refuse contains:

36.6 pounds of paper and cardboard; 20.2 pounds of garbage; 8.4 pounds of metal; 8.5 pounds of glass; 17.4 pounds of leaves, grass, hedge clippings and tree prunings; 2.6 pounds of scrap wood; 1.1 pound of plastics; and 5.2 pounds of miscellaneous material including leather, rubber, textiles, bricks, stones, and dirt.

xxx—Urban refuse generated in the U. S. in 1972 totaled 300 million tons, or the equivalent of more than 8 pounds daily for every man, woman, and child.

xxx—Only 220 million tons of municipal refuse was regularly collected by public agencies and private firms. The remainder (80 million tons) was abandoned, dumped at the point of origin, or hauled to uncontrolled disposal sites.

xxx—The volume of municipal refuse accumulating in the U. S. in a single year would cover an area half the size of the State of Connecticut (2,500 sq. mi.) with a layer of refuse 1 foot deep. This refuse contains some 12 million tons of iron and steel, 13 million tons of glass, and over a million tons of aluminum, zinc, lead, tin, and copper.

xxx—Collecting and disposing of refuse costs cities an average of $23 per ton ($18, for collection and $5, for disposal). New York City, at a cost of $40 per ton, spends almost a million dollars each day to collect and dispose of solid waste. Total U. S. bill runs about $6 billion annually.

xxx—Most municipal refuse is disposed of by dumping, landfill, or incineration. About 30 million tons of municipal refuse is

burned annually in more than 300 municipal incinerators. These incinerators generate 7.5 million tons of residues, which are then buried. The process developed by the Bureau to reclaim the values from incinerator residues has attracted world-wide attention. A commercial size plant of this type will soon be under construction in Lowell, Massachusetts, with seventy-five percent of the $3.2 million required, being provided by the Environmental Protection Agency.

xxx—Successful reclamation of mineral values from incinerator residues at the Bureau's pilot plant prompted research to save also that part of municipal refuse that is now being lost during burning. This would reduce the need for building more municipal incinerators, saving their construction and operating costs, and would bring income from salvaged paper and plastics as well as metals and glass. It would also eliminate air pollution problems connected with incineration.

xxx—Equipment for mechanical separation of metals, glass, paper, and plastics from municipal refuse before incineration has been assembled at Edmonston. The process involves coarse shredding of the refuse, followed with air classification, magnetic separation, screening, optical sorting, electrostatic separation, and gravity concentration—all proven methods used in the minerals industries.

xxx—Other refuse recycling schemes have been proposed and some are already under development. The process developed by the Bureau is unique in the following major respects: (1) it is the only process that embodies a complete system, (2) it is the only process capable of capturing and concentrating putrescibles and glass, (3) it is the only process that produces a tin can product suitable for detinning, (4) it is the only process capable of accepting extremely massive pieces of metal, (5) it is the only process that can successfully separate plastics and paper, and (6) energy requirements for the Bureau's process are by far the least of all proposed processes.

xxx—A plant processing 1,000 tons of raw refuse per day could be expected to reclaim each day enough ferrous metal to make all the iron and steel parts for more than 55 4-door sedans.

xxx—About 36 billion bottles are discarded each year in the U. S. as solid waste. Each American discards a glass bottle on the average of about one every two days. The average returnable beer bottle used to make 31 round trips from the brewery, to the consumer, and back to the brewery. The average is now

19 trips. In some cities, it is only 4. People are discriminating less between returnable and non-returnable bottles.

xxx—Glass reclaimed from raw refuse can be used in making new glass, or for such salable products as building bricks, mineral wool for insulation, and road surfacing (when ground and mixed with asphalt).

xxx—Aluminum present in refuse in the form of cans alone amounts to 10 percent of the total primary production. This metal together with other aluminum recovered from refuse would find a ready market at existing secondary smelters for conversion to high grade casting alloys.

xxx—The other heavy nonferrous metals could be used readily in producing brass ingot or the mixture could be further refined and separated into the constituent metals.

xxx—The rate at which we generate refuse is growing so fast that within 20 years, even if we are able to recycle 70 percent of our solid wastes our needs for landfill space will remain the same. And landfill space is, even now, becoming harder and harder to find.

[Refuse-disposal and refuse-recovery charts appear on pp. 718 and 719 respectively.]

URBAN REFUSE DISPOSAL IN THE UNITED STATES 1972

**Operating municipal incinerators**

7.5 million tons

30 million tons

**Incinerator residues presently going to dumps. Could be diverted to residue plants.**

**Municipal refuse of type which could be diverted to processing plants.**
140 M household
20 M commercial

130 million tons

**Municipal refuse now going to dumps. Could be diverted to raw refuse processing systems.**

160 million tons annually

**Urban ore (Urban refuse) 300 million tons generated annually**

140 million tons annually

**Other urban refuse contains**
80 M commercial
30 M fly ash
2 M junk autos
3 M tires
2 M appliances
23 M misc. rubble, light industrial waste, trees, rocks, other

Average composition applies to 160 million tons municipal refuse only

| Material | Percent |
|---|---|
| Glass | 8.5 |
| Nonferrous metal | .7 |
| Ferrous metal | 7.7 |
| Paper | 36.6 |
| Food waste | 20.2 |
| Yard waste | 17.4 |
| Plastics | 1.1 |
| Leather, rubber | 1.5 |
| Wood | 2.6 |
| Textiles | 2.0 |
| Dirt | 1.7 |

Average composition of incinerator residues

| Material | Percent |
|---|---|
| Glass | 34.0 |
| Ferrous metal | 30.8 |
| Nonferrous metal | 2.8 |
| Ash and slag | 32.4 |

140 million tons

**Disposed in part to dumps, by abandonment or disposal at origin, litter, other**

# BUREAU OF MINES DRYSORT REFUSE RECOVERY SYSTEM

## APPENDIX II TO OPINION OF DOUGLAS, J., DISSENTING IN PART

Section 102 of the National Environmental Policy Act, 42 U. S. C. § 4332 provides:

*§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts.*

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international

cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by subchapter II of this chapter.

Pub. L. 91–190, Title I, § 102, Jan. 1, 1970, 83 Stat. 853.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting in part.

I would reverse the judgment of the District Court and order the complaint dismissed because appellees lack standing to bring this suit. None of our cases, including inferences that may be drawn from dicta in *Sierra Club* v. *Morton,* 405 U. S. 727 (1972), where we denied standing to petitioner there, are sufficient to confer standing on plaintiffs in circumstances like these. The allegations here do not satisfy the threshold requirement of injury in fact for constituting a justiciable case or controversy. The injury alleged is that the failure of the Commission to suspend a 2.5% freight rate increase may discourage the transportation of recyclable materials, thus retarding the use of recycled materials, causing further consumption of our forests and natural resources (some of which might be taken from the Washington metropolitan area), and resulting in more refuse and undisposable materials to further pollute the environment.

The majority acknowledges that these allegations reflect an "attenuated line of causation," *ante,* at 688, but is willing to suspend its judgment in the dim hope that proof at trial will in some unexplained way flesh

them out and establish the necessary nexus between these appellees and the across-the-board rate increase they complain of. To me, the alleged injuries are so remote, speculative, and insubstantial in fact that they fail to confer standing. They become no more concrete, real, or substantial when it is added that materials will cost more at the marketplace and that somehow the freight rate increase will increase air pollution. Allegations such as these are no more substantial and direct and no more qualify these appellees to litigate than allegations of a taxpayer that governmental expenditures will increase his taxes and have an impact on his pocketbook, *Massachusetts* v. *Mellon,* 262 U. S. 447, 486–489 (1923), or allegations that governmental decisions are offensive to reason or morals. The general "right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted" does not confer standing to litigate in federal courts. *Fairchild* v. *Hughes,* 258 U. S. 126, 129 (1922). New York did not have standing to complain when it asserted merely the possible adverse effects of diversion of water from Lake Michigan upon hypothetical power developments in "the indefinite future." *New York* v. *Illinois,* 274 U. S. 488, 490 (1927). Assumed potential invasions are insufficient bases for a justiciable case or controversy. *Arizona* v. *California,* 283 U. S. 423, 462 (1931). As I see the allegations in this case, they are in reality little different from the general-interest allegations found insufficient and too remote in *Sierra Club.* If they are sufficient here, we are well on our way to permitting citizens at large to litigate any decisions of the Government which fall in an area of interest to them and with which they disagree.

Assuming, however, that a majority of the Court adheres to the conclusion that a constitutional case or controversy exists in these circumstances and that plain-

tiffs may sue, I would agree that the District Court erred in entering an injunction which Congress quite clearly had long since divested it of the power to enter. Accordingly, I join Part III of the Court's opinion. I add only that failure to maintain this country's railroads even in their present anemic condition will guarantee that recyclable materials will stay where they are—far beyond the reach of recycling plants that as a consequence may not be built at all.

MR. JUSTICE MARSHALL, concurring in part and dissenting in part.

I fully agree with and join in Part II of the Court's opinion wherein it sustains the District Court's determination that the appellees have standing to challenge the 2.5% interim surcharge on the ground that the Interstate Commerce Commission's order of April 24 permitting the surcharge to take effect was not issued in compliance with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U. S. C. § 4321 *et seq.* The Court goes on, however, to hold in Part III of its opinion that the District Court lacked power to issue a preliminary injunction barring implementation of the surcharge due to the Commission's alleged failure to comply with NEPA in the suspension stage of the rate proceeding. The Court's decision in this respect is, to be sure, a very narrow one; the decision clearly concerns only the scope of remedies available to the District Court in the context of a case of this particular character,[1] that is, an ICC rate suspension case.

---

[1] Given that the Court holds only that the District Court lacked power to grant preliminary injunctive relief, it presumably remains open to appellees to challenge the Commission's alleged failure to comply with NEPA in the suspension stage of the proceedings concerning the interim surcharge in an action for declaratory relief. Nor does anything in the Court's opinion today deny to the dis-

The Court specifically refrains from deciding whether or not the Commission's alleged failure to comply with NEPA in the suspension stage is a proper subject for judicial review and, if so, what would constitute adequate compliance with NEPA at that juncture in the administrative process. See *ante*, at 698–699, n. 22. Nonetheless, I am unable to join the third portion of the Court's opinion, for I am convinced that there is no lack of judicial power to issue a preliminary injunction against the interim surcharge in the context of these cases. I therefore must respectfully dissent from Part III of the Court's opinion.

At the outset, it is essential for purposes of analysis to put the issue upon which the Court disposes of the cases in proper perspective. Since the Court addresses only the issue of the District Court's power to grant preliminary relief, we must, of course, assume for the sake of argument that the issues which the Court does not now reach—namely, whether the procedural requirements of NEPA [2] are applicable at the suspension stage and whether the issue of Commission compliance is a proper one for judicial review [3]—are to be decided in appellees' favor. In addition, we must accept for the present appellees' assertions that the interim surcharge, by rais-

---

trict courts power to enjoin the Commission to comply with NEPA in the context of a particular rate proceeding so long as no injunction is issued barring implementation of the rates themselves, cf. *Atchison, T. & S. F. R. Co.* v. *Wichita Board of Trade, post,* p. 800.

[2] See in particular § 102 (2) (C) of the Act, 42 U. S. C. § 4332 (2) (C).

[3] Cf., *e. g., Upper Pecos Assn.* v. *Stans,* 452 F. 2d 1233 (CA10 1971), vacated and remanded for consideration of mootness *sub nom. Upper Pecos Assn.* v. *Peterson,* 409 U. S. 1021 (1972); *Calvert Cliffs' Coordinating Comm.* v. *Atomic Energy Comm'n,* 146 U. S. App. D. C. 33, 449 F. 2d 1109 (1971); *City of New York* v. *United States,* 337 F. Supp. 150, 158–160 (EDNY 1972).

ing the cost of shipping recyclable materials, will further accentuate the allegedly unjustifiable disparity between the cost of shipping those materials and the cost of shipping primary goods, thereby irrationally encouraging the use of primary goods which will lead to a further degradation of our environment. In other words, in considering the question of judicial power, we must accept the correctness of the District Court's determination that there was a "strong likelihood" that the Commission had erred in its conclusion that the interim surcharge " 'will have no significant adverse effect on . . . the quality of the human environment within the meaning of the Environmental Policy Act of 1969,' " 346 F. Supp., at 200, 201, a conclusion that had effectively excused the Commission from compliance with the procedural requirements of NEPA in the context of the surcharge, see 42 U. S. C. § 4332 (2)(C).

Turning then to the issue of judicial power, it must first be recalled that we deal here with the grant of only a preliminary injunction; the District Court did not permanently enjoin enforcement of the interim surcharge upon determining that the Commission had, in all likelihood, failed to comply with NEPA in the suspension stage. Properly viewed, I think the injunction at issue in this case amounts to nothing more than a legitimate effort by the District Court, following the Commission's refusal to suspend the surcharge, to maintain the *status quo* pending final judicial determination of the legality of the Commission's action at the suspension stage in light of the requirements of NEPA. And, by now, the equitable power of the federal courts to grant interim injunctive relief pending determination of an appeal is well established. The nature of that power was explored at length by the Court in *Scripps-Howard Radio, Inc.* v. *FCC,* 316 U. S. 4 (1942), where it was held that a court of appeals had power, pending determination of an ap-

peal, to stay the Federal Communications Commission's grant of a construction permit although the Federal Communications Act made no provision for such a stay. Speaking for the Court, Mr. Justice Frankfurter explained:

> "No court can make time stand still. The circumstances surrounding a controversy may change irrevocably during the pendency of an appeal, despite anything a court can do. But within these limits it is reasonable that an appellate court should be able to prevent irreparable injury to the parties or to the public resulting from the premature enforcement of a determination which may later be found to have been wrong. It has always been held, therefore, that as a part of its traditional equipment for the administration of justice, a federal court can stay the enforcement of a judgment pending the outcome of an appeal." *Id.,* at 9–10.

See also *FTC* v. *Dean Foods Co.,* 384 U. S. 597, 604 (1966); *Whitney National Bank in Jefferson Parish* v. *Bank of New Orleans & Trust Co.,* 379 U. S. 411, 425 (1965).

This Court has consistently adhered to the view that it will find federal courts to have been deprived of their traditional power to stay orders under review only in the face of the clearest possible evidence of a congressional intent to do so. See *Scripps-Howard Radio, Inc.* v. *FCC, supra,* at 11, 15. No such clear intent is to be found in the Interstate Commerce Act, at least not with respect to a case such as this where the Commission has already acted on the relevant issue and the issue lies in an area outside the Commission's traditional expertise.[4] In *Arrow Transportation Co.* v. *Southern R.*

---

[4] Thus, I cannot accept the Court's assertion that the question here is "whether in a specific context NEPA *sub silentio* revived

*Co.,* 372 U. S. 658, 664 (1963), this Court specifically acknowledged that "[i]t cannot be said that the legislative history of the grant of the suspension power to the Commission includes unambiguous evidence of a design to extinguish whatever judicial power may have existed prior to [the establishment of suspension powers in the Commission] to suspend proposed rates." The *Arrow* Court was asked to extend by injunction the statutory seven-month suspension period, see 49 U. S. C. § 15 (7), because the Commission had not reached a decision on the lawfulness of the proposed rates at the end of the suspension period and the rail carriers, following a period of voluntary suspension, were threatening to implement the rate change without awaiting final agency action. Despite the ambiguity of the legislative history, the Court, upon careful examination of the character of and reasons for the suspension scheme, concluded that Congress must have intended to deprive the federal courts of the power to suspend rates pending completion of agency action and thus that the traditional equitable powers of the federal courts had been overridden to that extent. But, as detailed consideration of the factors that motivated the decision in *Arrow* reveals, this litigation presents a significantly different problem.

The *Arrow* Court felt that an injunction extending the suspension period pending final agency action would involve a serious, unintended intrusion on the primary jurisdiction of the Commission. This problem of primary jurisdiction had two aspects in *Arrow*. First, where the issue is the reasonableness of proposed rates, an application for an injunction against implementation of

---

judicial power that had been explicitly eliminated by Congress." *Ante,* at 696. That is a question which I do not believe need ever be reached here, for—as shall be seen—Congress has not, to begin with, deprived the federal courts of their traditional equitable powers in the context of these cases.

those rates pending final agency action would necessarily require a federal court "to pass before final Commission action upon the question of reasonableness of a rate," 372 U. S., at 671, thereby providing, in effect, an advisory judicial opinion to the Commission on an issue which Congress intended that the Commission decide in the first instance. Certainly, the Commission's expertise in matters of rail carrier operations and economics is well recognized, and *Arrow* clearly indicates that the courts should not interfere with the exercise of that expertise. However, the grant of preliminary relief here involves no such interference with the Commission's initial exercise of its particular expertise.

So far as I am aware, the Commission has never been deemed especially expert in matters of environmental policy or impact.[5] It is, of course, true that the Commission must decide in the first instance whether particular proposed action constitutes "major Federal action significantly affecting the quality of the human environment," thus necessitating agency compliance with the detailed requirements of § 102 (2)(C) of NEPA, 42 U. S. C. § 4332 (2)(C). But that decision had already been made in this case *prior to* the time when judicial intervention by the District Court was sought—in contrast to the situation in *Arrow* where the question of the reasonableness of the rates remained unresolved by the Commission. Even assuming that some element of agency expertise is involved in the decision at issue here, the District Court, in granting preliminary relief against the interim surcharge, passed only upon a question of which the Commission had finally disposed, namely, the environmental impact of not suspending the interim sur-

---

[5] Administrative expertise in such matters is surely lodged with the Environmental Protection Agency and the Council on Environmental Quality.

charge and of permitting it to take effect at once. Thus, for purposes of the particular issue raised here, the District Court was presented with final agency action [6] and was not in danger of interfering with the Commission's expertise when it stayed the Commission's order pending final determination of the appeals.[7]

The other aspect of the problem of primary jurisdiction focused upon in *Arrow* was the timing of the implementation of new rates. The Court concluded that Congress had intended that the Commission should determine when new rates should take effect. See 372 U. S., at 668. Insofar as the economic impact of rate increases was concerned, Congress enacted a scheme which permitted the Commission to take into account the interests of both rail carriers and shippers. Thus, Congress recognized that economic necessity might persuade the Commission to permit otherwise questionable rates to go unsuspended while they were being investigated, and, at most, it allowed the Commission to suspend proposed rates for only seven months, see 49 U. S. C. § 15 (7). At the same time, Congress attempted to accommodate the economic interests of shippers, for it gave the Commission power, pending final agency action, to require the rail carriers to maintain detailed records of monies received due to the increase and to compel payment of refunds if a rate increase was ultimately found to be unreasonable.[8] See *ibid.*

---

[6] Cf. L. Jaffe, Judicial Control of Administrative Action 688 (1965).

[7] Contrast *Atchison, T. & S. F. R. Co.* v. *Wichita Board of Trade, post,* p. 800.

[8] Moreover, even if the Commission fails to require recordkeeping and the payment of refunds *sua sponte,* Congress also provided a mechanism by which shippers may initiate an action before the Commission to seek reparations from a carrier on the ground that particular rates are unreasonable. See 49 U. S. C. § 13 (1).

*Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658

But where does the Interstate Commerce Act make provision for an accounting and "refund" to the people of our Nation for the irreversible ecological damage that results from a rate increase which discriminates unreasonably against recyclable materials and has been allowed to take effect without compliance with the procedural requirements of NEPA?[9]  The Court today says that "[t]o allow judicial suspension for noncompliance with NEPA, would disturb the careful balance of interests" struck by Congress in the suspension and refund provisions.  *Ante,* at 697.  Yet the simple fact is that in the

(1963), to be sure, did not involve an economic dispute between shippers and rail carriers, but was, instead, an action brought by water carriers which contended that certain challenged decreases in the rates of competing rail carriers were designed to destroy them rather than to reach legitimate economic objectives.  Obviously, the refund and reparation provisions of the Interstate Commerce Act were of no more value to the water carriers in *Arrow* than they are to the nonshipper appellees in this case.  But, as the Court pointed out in *Arrow,* "[c]onflicts over rates between competing carriers were familiar to the Commission long before [the enactment of the suspension provisions] . . . .  Indeed, in another provision [namely, 49 U. S. C. § 4 (2)] of the very same statute [that established the suspension powers] Congress . . . dealt explicitly with the *reduction* of rates by railroads competing with water carriers . . . .  In addition § 8 of the Act, 49 U. S. C. § 8, creates a private right of action for damages—based upon conduct violative of the Act—which might be available . . . ."  372 U. S., at 669.  Thus, Congress had taken into account, and had provided for, disputes between competing carriers, as well as between shippers and carriers, in enacting the suspension provisions.  The same can hardly be said for conflicts between the environmental policies of NEPA and the Commission's suspension power.

[9] Indeed, given the substantial element of public interest at stake in a case such as this, it is appropriate to recall Mr. Justice Stone's oft-quoted admonition: "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."  *Virginian R. Co.* v. *Systems Federation No. 40,* 300 U. S. 515, 552 (1937).

carefully designed suspension and refund scheme no balance was struck with respect to the environmental interests that have been recognized by Congress in NEPA *since* the introduction of the suspension provisions into the Interstate Commerce Act. Under these circumstances, we can hardly infer an intent on the part of Congress to deprive the federal courts of their traditional responsibility, in passing upon a request for equitable relief, to work an accommodation in each particular case of the competing interests of the relevant parties [10]— that is, of a rail carrier's alleged need for increased income that will otherwise be forever lost each day that the new rate is not charged and of the extent of irreversible environmental damage that might result if the rates are not suspended. The District Court, in its effort to preserve the *status quo* pending final review of the Commission's April 24 order, gave full consideration to the effects on all parties of either granting or denying preliminary relief against the interim surcharge.[11] In then temporarily enjoining the surcharge, I believe that the District Court acted within the scope of its legitimate powers.

To summarize, then, I obviously cannot agree with the Court's assertion that "each of the policies that we identified in *Arrow* as the basis for § 15 (7) would be substantially undermined if the courts were found to have suspension powers simply because noncompliance with NEPA was alleged." *Ante,* at 696. In *Arrow* itself, the Court was at pains to point out that its deci-

---

[10] Cf. *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329–330 (1944).

[11] Thus, the District Court, fully recognizing the financial plight of the rail carriers, carefully limited its preliminary injunction to the application of the interim surcharge to recyclable materials, "allowing [the rail carriers] to collect the surcharge on all non-recyclable goods." 346 F. Supp., at 202.

sion did not "reflect in any way upon decisions which have recognized a limited judicial power to preserve the court's jurisdiction or maintain the *status quo* by injunction pending review of an agency's action through the prescribed statutory channels." 372 U. S., at 671 n. 22. True, the Court went on to say there that "[s]uch power . . . has never been recognized in derogation of such a clear congressional purpose to oust judicial power as that manifested in the Interstate Commerce Act." *Ibid.* But the import of that remark must be judged with a full understanding of the factors underlying the *Arrow* Court's finding of "such a clear congressional purpose." As has been seen, close analysis of those factors identified certainly does not compel extension of the *Arrow* holding to the request for preliminary injunctive relief in this litigation.[12] The Court would do well to re-

___

[12] The *Arrow* Court also pointed out that experience with judicial injunctions against rates prior to the establishment of the Commission's suspension powers in § 15 (7) had "resulted in disparity of treatment as between different shippers, carriers, and sections of the country, causing in turn 'discrimination and hardship to the general public.'" 372 U. S., at 664. These results were due both to the conflicting views of lower federal courts as to their power to enjoin rates pending agency determination of their lawfulness and conflicting judgments of different courts as to the reasonableness of the same rates. See *id.*, at 663–664. But the danger of conflicting judgments concerning the same rates and unevenhanded treatment of shippers and carriers, merely because of the fortuity of the particular judicial district in which they are located, is not present where, as here, the allegation is that the Commission has failed to follow the requirements of a statute—NEPA—relevant to the exercise of its regulatory jurisdiction and the Commission has, as a consequence, been joined in the suit as a defendant. So long as the Commission has been made a party, it is possible to ensure uniformity of treatment by enjoining the Commission to exercise its suspension powers where a failure to comply with NEPA is believed to exist. This is what the District Court did here when it enjoined the Commission "from permitting . . . the 2.5 per cent surcharge" to be collected by the rail

member that "[w]here Congress wished to deprive the courts of [their] historic power [to enjoin orders pending review], it knew how to use apt words . . . ." *Scripps-Howard Radio, Inc.* v. *FCC,* 316 U. S., at 17. Cf. *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329 (1944). Nothing in the language of the Interstate Commerce Act or in the particular structure of that Act or even in our decision in *Arrow* compels the conclusion that Congress has done so here. I must therefore dissent from the Court's ultimate disposition of these cases.

---

carriers "pending further order of this court." See Jurisdictional Statement 30a. It may be that the danger of conflicting results where the Commission has not been made a party would warrant a court staying its hand, but that is not a problem here.