Victor GARCIA, et al., Plaintiffs,

v.

Hon. Clayton K. YEUTTER, et al., Defendants.

Civ. A. No. 90–0981.

United States District Court, District of Columbia.

Dec. 28, 1990.

Kristine Poplawski, Farmworker Justice Fund, Inc., Washington, D.C., Robert A. Williams, Florida Rural Legal Services, Inc., Immokalee, Fla., for Garcia, Avila and Vasquez.

Richard Kohn, Cal. Rural Legal Assistance, San Francisco, Cal.

Laurence Gold, Walter A. Kamiat, Washington, D.C., for AFLCIO.

Raymond Larizza, Dept. of Justice, Civ. Div., Washington, D.C., for Yeutter.

Monte Lake, McGuiness & Williams, Washington, D.C., Amicus Curiae, Farm Labor Alliance and National Council Agriculture Employees.

## MEMORANDUM AND OPINION

REVERCOMB, District Judge.

### I. BACKGROUND

The plaintiffs, two United States citizens and a permanent resident of the United States who work as farm laborers in the United States and the AFL/CIO, have brought this action for declaratory and injunctive relief against various actions taken by the defendants in implementing the Replenishment Agricultural Worker ("RAW") program created by the Immigration Reform and Control Act of 1986 ("IRCA" or "Act"). Congress enacted IRCA to control the entry of undocumented workers into this country by prohibiting the employment of aliens who are unauthorized to work in the United States. Immigration Reform and Control Act of 1986, H.R.Rep. 682, 99th Cong., 2d Sess., pt. 1, at 46, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5649, 5650. The Act created a system of civil and criminal penalties to be imposed on employers who violate its prohibitions. *Id.*

Congress recognized, however, that a special agricultural worker program was needed to counter the labor reduction that would result from the implementation of IRCA. As the Committee report explains:

> Extensive testimony was received to the effect that employer sanctions will result in the removal of substantial numbers of undocumented individuals from the agricultural work force. Agricultural interests, particularly western growers of perishable agricultural commodities ... have come to rely heavily on the existence of an undocumented work force.

*Id.* at 5687. Thus, Congress developed two programs pertaining to "seasonal agricultural services," to give effect to the Act's employer sanctions while, at the same time, "prevent[ing] labor shortfalls and dislocations which have the potential to disrupt harvests and interfere with marketing process." *Id.*

The first program, the Special Agricultural Worker ("SAW") program, established a process by which individuals having employment experience in perishable crops would be allowed to become permanent resident aliens of the United States. 8 U.S.C. § 1160. Workers permitted to reside in this country under the SAW program, however, are not required to continue to perform agricultural work. Accordingly, Congress created a second program to provide for the replenishment of the seasonal agricultural workforce through the admission of additional aliens into this country. H.R.Rep. 682, *supra*, 1986 U.S. Code Cong. & Admin.News at 5689–90.

The RAW program requires the Secretaries of Labor and Agriculture (Secretaries) each year from 1990 to 1993 to determine whether or not a shortage of seasonal agricultural workers exists. The determination is to be based on a calculation of the "shortage number," which is derived, basically, by subtracting the supply of seasonal agricultural workers in the United States from the need for such labor.

The House Report to the IRCA outlines the manner in which the Secretaries are to derive the supply and need estimates. *Id.* at 5691. Based on the shortage number calculated from those estimates, the Secretaries are to "jointly determine the number (if any) of additional aliens who should be admitted to the United States or who should otherwise acquire the status of aliens lawfully admitted for temporary residence under this section during the fiscal year to meet a shortage or workers to perform seasonal agricultural services in the United States during the year." 8 U.S.C. § 1161(a)(1).

The RAW program also includes an emergency procedure for increasing the shortage number during a fiscal year to permit the admission of additional foreign workers. *Id.* § 1161(a)(7). The purpose behind the emergency procedure is explained in the Committee report:

The Committee anticipates that the emergency increase provision would apply in cases of an unanticipated bumper crop, a significant change in weather conditions or cropping patterns, or other significant changes that could not have been reasonably predicted or accounted for in the original determination of the shortage number for a fiscal year. It is not designed or intended to deal with localized, short-term problems that individual farmers may have in obtaining needed seasonal agricultural workers. The emergency provisions of the replenishment worker section are intended to provide for an increase where there was a significant understatement of the shortage number needed for a fiscal year.

H.R.Rep. 682, *supra*, 1986 U.S.Code Cong. & Admin.News at 5691. According to the procedure, "[a]fter the beginning of a fiscal year, a group or association of employers ... may request the Secretaries to increase the shortage number for the fiscal year upon a showing that extraordinary, unusual, or unforeseen circumstances have resulted in a significant increase in the shortage number" due to a significant increase in the need for seasonal agricultural labor, a significant decrease in the supply of such labor, or a significant decrease in the number of man-days worked by aliens recently admitted. 8 U.S.C. § 1161(a)(7)(A). The Secretaries must publish a notice of any request made pursuant to the emergency procedure provision, afford interested parties an opportunity to respond, and make and publish their determination within 21 days of the receipt of the request. *Id.* § 1161(a)(7)(B), (C).

The Secretaries promulgated regulations to implement the RAW program. In Count I of the Complaint, plaintiffs have challenged the rulemaking which resulted in the regulations setting forth the methodology for determining the annual shortage number as violative of the Administrative Procedure Act ("APA"). The plaintiffs have also challenged the determination of the shortage number in 1990 on the bases that it violated the APA (Count II), that it violated the RAW statute (Count III), and that it constituted arbitrary and capricious agency action (Count IV). Finally, the plaintiffs assert that the Secretaries acted arbitrarily and capriciously in promulgating regulations to implement the emergen-

cy procedures for increasing the shortage number (Count V).[1] The Court only reaches the merits of the plaintiff's claims to the extent necessary to determine whether the plaintiffs have standing to bring this action.

## II. ANALYSIS

 A party seeking review of an administrative action must show that it " 'ha[s] been or will in fact be perceptibly harmed by the challenged agency action.' " *Competitive Enterprise Institute v. National Highway Traffic Safety Administration*, 901 F.2d 107, 112 (D.C.Cir.1990) (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)). The injury alleged may be either actual or threatened. *Id.* (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)). The plaintiffs in this case have alleged both immediate and threatened injury from the actions of the defendants.[2]

 In analyzing standing issues, the Court must accept as true all material allegations of the Complaint. *United Transportation Union v. Interstate Commerce Commission*, 891 F.2d 908, 911 (D.C.Cir. 1989), *cert. denied* — U.S. ——, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990). However, as recognized by our Court of Appeals, this requirement is often difficult to apply in cases alleging threatened harm:

> We are mindful that in analyzing standing issues, we "must accept as true all material allegations of the complaint." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). This obligation, at least at first blush, might appear to be in tension with the Court's further admonition that an allegation of injury or of repressibility that is too speculative will not "suffice to invoke the federal judicial power." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976); *accord Warth*, 422 U.S. at 507, 95 S.Ct. at 2209. We think this ostensible tension is reconciled by distinguishing allegations of facts, either historical or otherwise demonstrable, from allegations that are really predictions. When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions....

*Id.* at 911–12. In keeping with these principles, this Court first considers the allegations of immediate injury and then those of threatened future injury.[3]

---

1. The plaintiffs do not allege that this rulemaking violated the APA.

2. The AFL/CIO, as an association, has standing to challenge agency action only if its members would otherwise have standing to sue in their own right. *Associated Gas Distrib. v. FERC*, 899 F.2d 1250, 1258 (D.C.Cir.1990). Thus, the Court's analysis of whether the individual plaintiffs have standing to bring this suit will also determine the association's standing.

3. This opinion focuses on the injuries alleged and discussed at oral argument; but those alleged injuries primarily concern Counts II–V of the Complaint. In Count I of the Complaint, plaintiffs allege that the defendants violated the procedural requirements of the APA in promulgating regulations pertaining to the methodology for determining the shortage number. The defendants have argued that, even if the plaintiff allegations are true, "there is no allegation of any kind suggesting any substantive defect in the methodologies." Def. Memorandum at 28. The defendant properly notes that the APA directs courts reviewing agency actions to give due consideration to "prejudicial error" caused by any procedural deficiency in the rulemaking process. APA § 706. Thus, even if the Court were to find on the merits that the regulations were procedurally flawed, it would have to consider the prejudice to the plaintiffs from the procedural violations alleged. Plaintiff has not alleged any prejudice; nor is it likely that they can, since, contrary to their factual allegations, the notice of the proposed rule was published, plaintiffs did in fact have an opportunity to comment on the proposed rule, and the final rule adequately stated its basis and purpose. Accordingly, the Court finds that the plaintiffs have no standing to assert the APA violations in Count I of the Complaint.

## A. Immediate Injury—Determination of 1990 Shortage Number and Publication of Notice by Secretaries

The plaintiffs have alleged immediate injury resulting from the manner in which the Secretaries determined the 1990 shortage number and published notice of their determination.[4] In 1990, after estimating the supply and need for seasonal agricultural labor for the fiscal year and calculating the shortage number, the Secretaries determined that there would be no shortage of seasonal labor because the shortage number was negative, indicating a surplus of domestic labor. Accordingly, the following notice was published in the Federal Register:

> Notice is hereby given that the Secretaries of Agriculture and Labor (the Secretaries) have determined jointly that the number of additional aliens who should be admitted to the United States or who should otherwise acquire the status of aliens lawfully admitted for temporary residence under section 210A of the Immigration and Nationality Act (INA) to meet a shortage of workers to perform seasonal agricultural services (SAS) during fiscal year 1990 is zero.

55 Fed.Reg. 39 (Jan. 2, 1990).

■■■■ Plaintiffs claim injury resulting from the defendants' failure to indicate in its published notice that the shortage number calculated for 1990 was a negative number[5] and, thus, represented the existence of a surplus of domestic labor. This claim is based on the assumption that the defendants were required by the statute to publish the shortage number and not just the number of additional seasonal agricultural workers to be admitted into the United States. Accepting the plaintiffs' interpretation of the statutory language for purposes of standing analysis,[6] the Court nonetheless finds that the defendant's failure to publish the negative shortage number did not injure the plaintiffs.

Plaintiffs assert in their Complaint that, as a result of the defendants' actions, they "will suffer greater competition for scarce agricultural employment in seasonal agricultural services, with concomitant lower wages and greater unemployment as a result of the unlawful importation of foreign agricultural workers under the Defendants' inaccurate determination of the shortage number and regulations governing emergency increases." Complaint ¶ 13. The Court cannot accept this assertion of injury, as it completely contradicts the factual record in this case. Because their calculation of the shortage number for 1990 resulted in a negative figure, the Secretaries announced that *zero* additional aliens would be admitted into the United States to perform agricultural services in 1990. Thus, even assuming, as the plaintiffs' allege, that the Secretaries' determination of the shortage number was "inaccurate", that determination could not and, in fact, did not result in the "unlawful importa-

---

**4.** Since the commencement of this suit, the defendants have determined the 1991 shortage number. 55 Fed.Reg. 39,993 (Oct. 1, 1990). Plaintiffs have challenged that number on the same bases that it challenged the 1990 number. For purposes of this Memorandum and Opinion, the Court will discuss the challenges as they relate to the 1990 number.

**5.** Plaintiffs assert that the shortage number for 1990 was roughly negative 100,000. Complaint ¶ 29.

**6.** The Court notes, however, that the language of the statute does not indicate that publication of the shortage number is required. The statute states that the Secretaries "shall jointly determine the number (*if any*) of additional aliens who should be admitted to the United States...." 8 U.S.C. § 1161(a)(1) (emphasis added). The statute further states that "[s]uch number is ... referred to as the 'shortage num-

ber'." *Id.* Although the provision seems to speak of the shortage number and the number of aliens to be admitted in a given year as being the same number, such an interpretation leads to an awkward result in years where there is a negative surplus number. In such years, under plaintiffs' reading of the statute, the Secretaries would have to announce the admission of a negative number of aliens. This result was clearly *not* intended by the statute, which requires the Secretaries to determine the number of aliens *if any* to be admitted. Moreover, the RAW program focuses entirely on labor shortages, not surpluses; and the shortage number was devised as the method for determining *shortages* not surpluses. Thus, the statute does not require the Secretaries either to publish the negative shortage number or to otherwise indicate the existence of a labor surplus.

tion" of foreign workers. Plaintiffs' alleged injury resulting from the regulations governing emergency increases is discussed in the section of this Opinion concerning the alleged threatened injury to the plaintiffs.

In their opposition to the defendant's motion, the plaintiffs restated their alleged immediate injury: "the Secretaries' failure to acknowledge the true size of the labor surplus leads agricultural employers to believe that they need not improve wages to attract workers, but may rely instead on emergency RAW admissions to fill any expected labor need." Pl.Opp. at 20. This allegation also is a nonsequitur. Simple economics suggests that the existence of a large surplus of labor would create a disincentive for employers to improve wages to attract workers. Thus, if the defendants' failure to point out the size of the surplus had any effect on agricultural employers, it would have had the opposite effect to that suggested by the plaintiffs. Upon receiving notice that no aliens would be admitted in 1990, employers would assume the need to compete for the existing domestic supply. However, if employers were also informed of the sizeable surplus of such domestic labor, they might not feel compelled to improve wages and conditions to attract workers. For these reasons, the Court finds that the plaintiff has not been injured by the defendants' failure to publish the negative shortage number.

■ Plaintiffs have also challenged the 1990 figure on the basis that its determination constituted rulemaking and that the defendants failed to follow the procedures required by the APA for rulemaking. Count II, Complaint ¶¶ 38–41. The defendants assert that the calculation of the annual shortage number did not constitute rulemaking but rather an informal agency adjudication. As discussed in an earlier footnote, even if rulemaking procedures were required and were not provided, the plaintiff must demonstrate "prejudicial error."[7] The plaintiffs claim to have been injured by the failure to comment on the method used for determining the supply and need of labor for calculation of the shortage number. However, assuming for purposes of standing analysis that annual shortage number determination did constitute rulemaking, since the shortage number for 1990 was negative, thereby precluding admission of additional alien labor, the Court finds that no prejudice to the plaintiff has resulted from the defendants' failure to provide the required procedures.

■ Finally, the plaintiffs challenge the Secretaries' determination of the 1990 figure as arbitrary and capricious agency action. Count IV, Complaint ¶¶ 45–46. This claim is based upon the Secretaries' failure in estimating the supply of domestic labor to consider "the effect that enhanced recruitment or improved wages and working conditions offered by employers would have on the availability of workers to perform seasonal agricultural services in [the] fiscal year, in violation of 8 U.S.C. §§ 1161(a)(5)(B)(ii) and 1161(a)(5)(C)(i) and (ii)." *Id.* ¶ 46. The defendants have admitted this failure but assert that no prejudice to the plaintiffs has resulted from their failure in this respect since the shortage number determined for 1990 was negative. The effect, if any, that consideration of the factors stated above would have had on the shortage number determination could only be to increase the labor surplus and, therefore, to increase the negative shortage number. For the reasons stated above, because the plaintiffs have failed to demonstrate any injury incurred from the Secretaries failure to announce the existence of a labor surplus, the Court cannot find that the plaintiffs are further injured by the fact that the Secretaries may have underestimated the size of the surplus.

B. *Threatened Injury—Operation of the Emergency Increase Provisions*

The plaintiffs' alleged injury resulting from the emergency provisions of the RAW program involves threatened injury. As discussed in the beginning of this Opinion, allegations of threatened injury may be rejected if they are based upon predictions

7. *See supra* note 1.

of future events. Plaintiffs claim that operation of the emergency procedures will injure them in two ways. First, in years such as 1990, where the Secretaries announce a shortage number of zero despite the existence of a significant labor surplus, the plaintiffs claim that the emergency adjustment will be made to the zero figure rather than to the actual negative shortage number that is derived when supply is subtracted from need. Second, the plaintiffs claim that the regulations promulgated by the Secretaries to implement the emergency procedures violate the statute which they implement by disregarding the shortage number and by permitting easier invocation of the procedures than that authorized in the statute. These aspects of the emergency provisions injure the plaintiffs by permitting the admission of a greater number of additional foreign workers than that permitted by the statute and basing such admission on a more lenient threshold showing. The result of these statutory violations is to create additional competition for domestic laborers like the plaintiffs.

■ Without considering the merits of the claims raised by the plaintiffs, the Court notes that the emergency provisions of the RAW program have not been invoked to date; therefore, any claims as to how they would operate to injure the plaintiffs are, by their nature, predictions of future conduct.[8] Moreover, in light of the existence of a significant labor surplus for seasonal agricultural services in 1990 and 1991, it is speculative as to whether the emergency provisions will ever be invoked during the four years in which the RAW program is to operate. Thus, in addition to its concerns about the plaintiffs' standing to raise these claims, the Court is also faced with the question of whether the plaintiffs' claims of threatened injury present a justiciable case or controversy. In this context, the Court is wary to issue what may be no more than an advisory opinion as to how the emergency provisions should be operated. However, the Court finds that should the emergency provisions be invoked at some point in the future, the plaintiffs are afforded adequate opportunity to challenge their operation through the notice and comment procedures required by the emergency provisions. 8 U.S.C. § 1161(a)(7)(B). Accordingly, the Court holds that the plaintiffs' claims of threatened injury are not ripe for judicial consideration.

■ The Court also bases its dismissal of the plaintiffs' claims as to the operation of the emergency provisions on the plaintiffs' lack of standing. The Court finds that the plaintiffs' allegations concerning the invalid operation of the emergency procedures constitute no more than overly speculative predictions of how the Secretaries will act. The predictions are not supported by the statute or the regulations and have been persuasively contradicted by the defendants.

■ As to the first allegation, there is no evidence that the secretaries will use zero as a basis for determining the increase in shortage number required by an emergency situation. The defendants have explained that there is a difference between the shortage number calculated and the number of aliens permitted to enter the country in a given fiscal year. The first number is used to determine what number, *if any*, of aliens will be admitted. The defendants have never suggested that the shortage number was not a negative number, they simply maintain that their duty to report to the public is limited to notice of the number of aliens to be admitted. Therefore, it does not follow, as the plaintiffs seem to assume, that the defendants will ignore the labor surplus and consider the shortage number to be zero for purposes of determining whether an increase in that number is warranted by a request filed under the emergency provisions. In fact, counsel for the defendants stated in oral argument that it is the negative shortage that is referred to and not the zero

---

8. These predictions are even more speculative because they involve future actions to be taken by third parties—those parties who would request an emergency increase in the shortage number. *See United Transp. Union*, 891 F.2d at 912.

figure in determining whether to increase the shortage number. Thus, this action predicted by the plaintiffs is not only speculative, but almost certain not to occur.[9]

The plaintiffs' second allegation, that the regulations implementing the emergency provisions violate the RAW statute is not speculative but simply contradicts the plain language of the statute and regulation. The plaintiffs claim that the regulations "permit the granting of emergency increases in the absence of any showing that extraordinary, unusual and unforeseen circumstances have resulted in a significant increase in the shortage number." This allegation is based on the fact that the statute requires a showing that unforeseen circumstances have resulted in "a significant increase in the shortage number," whereas the regulation requires a showing that the unforeseen circumstances resulted in "significant shortage of workers to perform [seasonal agricultural services]." Pl. Memorandum at 35. The Court finds, however, that the language of the regulation refers to the same effect as the language of the statute. The shortage number represents the extent to which the need for labor exceeds the supply available domestically. Thus, it is equivalent to the "shortage of workers to perform seasonal agricultural labor." Moreover, because both the regulation and the statute require a *significant* shortage (or increase in the shortage number) before the emergency provisions can be invoked, the regulation does not allow the admission of foreign labor beyond that permitted by the statute. Thus, the Court rejects the plaintiffs' claim that it may be subjected to future injury by the operation of the regulation.

## III. CONCLUSION

Because the Court finds that the plaintiffs have failed to establish standing to assert any of the claims presented in this action, judgment is entered in favor of the defendants.

---

9. Plaintiffs' claim that the regulations also contradict the statute by substituting a concept of regional labor shortage for the statute's national shortage figure is also unsupported by the language of the statute and regulation. Pl. Memorandum at 32. The House Report clearly states Congresses' intention that the emergency provisions not be applied to "localized, short-term problems" faced by "individual farmers." H.R. Rep. 682, *supra*, 1986 U.S.Code Cong. & Admin. News at 5691. Both the statute and the regulation expressly require that a *significant* increase in the shortage number or labor shortage be shown before an emergency adjustment will be made. Clearly, such a requirement ensures that the emergency provisions will only operate in circumstances affecting a significant segment of the agricultural sector.