932 F.Supp. 1247 (1996)
COLORADO ENVIRONMENTAL COALITION, Plaintiff,
v.
BUREAU OF LAND MANAGEMENT, Defendant,
and
National Fuels Corporation, Intervenor.
Civil Action No. 96-WY-1458-AJ.
United States District Court, D. Colorado.
July 12, 1996.
*1248 *1249 Debra Dittmar Asimus, Robert Baxter Wiygul, Sierra Club Legal Defense Fund, Inc., Denver, CO, for Colorado Environmental Coalition.
Lyle K. Rising, of counsel, Office of Solicitor, Dept. of Interior, Lakewood, CO, Michael Hegarty, Assistant U.S. Attorney, Denver, CO, Regional Solicitor, Rocky Mtn. Region, Denver, CO, for Bureau of Land Management.
Barbara J.B. Green, Allan L. Hale, Denver, CO, for Natl. Fuel Corp.

MEMORANDUM OPINION AND ORDER
ALAN B. JOHNSON, Chief Judge, Sitting by Designation.
This is an action brought by Colorado Environmental Coalition ("CEC") seeking judicial review of the administrative record of the Bureau of Land Management ("BLM"), approving the application of intervenor, National Fuel Corporation ("NFC"), to drill two gas wells and construct an access road in a wilderness study area ("WSA") in the Grand Junction Resource Area in Garfield County, Colorado. CEC is seeking injunctive and other relief to stop the implementation of the planned road-building and drilling.

PROCEDURAL HISTORY
In 1994 and 1995, NFC applied for a permit to drill on 2,518.55 acres of land leased to it by BLM in Garfield County, Colorado. Exhibits 1 and 2, Plaintiff's Memorandum. The lease was executed in 1970, and a natural gas well located on the leased land, has been producing since 1977. Although the producing well is located on a portion of the lease not included within the WSA, the permit sought to drill two wells on portions of the lease located within the Demaree Canyon WSA. The BLM created the WSA as a result of Section 603 of the Federal Land Policy and Management Act of 1976 ("FLPMA"). 43 U.S.C. §§ 1701-1782 (1988). Congress ordered the BLM to study all land under its management for possible inclusion in the nation's wilderness system, established by the Wilderness Act of 1964, 16 U.S.C. § 1131 et seq. (1988). However, Section 701 of FLPMA preserved "valid existing rights" to permit activity on mineral leases issued before the enactment of FLPMA in 1976.
The BLM designated the Demaree Canyon WSA, as it was required to do by statute, and then prepared the study ordered by Congress to determine whether it should receive wilderness designation. The study included preparation of an environmental impact statement ("EIS"), which resulted in a recommendation that the Demaree Canyon WSA not be included in the wilderness system due to the values represented by natural *1250 gas and other resources. The recommendation was adopted by the Secretary of the Interior in his submittal to Congress on October 18, 1991. To date, Congress has not acted upon the Secretary's recommendation.
In September of 1995, an Environmental Assessment ("EA") was completed by personnel of the Grand Junction District Office. On November 20, 1995, the Record of Decision was issued by Catherine Robertson, Area Manager, finding and determining after review of the EA "that the proposed action would not have a significant impact on the human environment." Exhibit 4, Record of Decision, November 20, 1995, attached to Plaintiff's Memorandum. In accordance with this determination, no environmental impact statement would be required and the BLM issued permission to drill to NFC pursuant to the Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 226(g) (1988).
The permitting action of the District Office of the BLM was appealed by the plaintiff, CEC, to the State Director of the BLM, alleging failure to comply with the National Environmental Policy Act of 1969 ("NEPA"), as amended, 42 U.S.C. § 4332, pertaining to the preparation of an environmental impact statement, as well as violations of FLPMA, Section 603, related to the standard for conducting mineral leasing activity on WSA lands. After the State Director affirmed the Record of Decision of the Area Manager, CEC appealed to the Interior Board of Land Appeals (IBLA"), which affirmed the decision by its order. Exhibits 5 and 6, Plaintiff's Memorandum, and Colorado Environmental Coalition, 135 IBLA 356 (June 5, 1996). Throughout the administrative review process, NFC has been stayed from activity related to access to or drilling on the lease.
On June 14, 1996, CEC filed its complaint and motion for temporary restraining order in the instant action. Following a hearing, the TRO was issued on June 17, 1996, with the imposition of a nominal bond requirement. At that hearing, the parties agreed to an expedited hearing on the merits of the plaintiff's action seeking injunctive relief and appealing the IBLA decision. That expedited hearing was held before this Court on June 19, 1996.

STANDING
At the hearing on June 19, 1996, following a review of the supplemental affidavits and declarations filed by plaintiff, the defendants' objections to CEC's standing as a plaintiff were withdrawn. The Court notes that the standing doctrine gives emphasis to the need that litigation be conducted between true adversaries and avoidance of court involvement in governmental actions that are best left to agencies possessing expertise. An organization asserting standing to challenge agency action must show injury in fact and that the interests sought to be protected are arguably within the zone of interests intended to be protected by the statute. Association of Data Processing Serv. Orgs. v. Camp., 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The injury in fact element requires that the plaintiff have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) `actual or imminent, not conjectural or hypothetical.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Here, the plaintiff organization, CEC, is alleging injury to its members as the basis of its standing. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Neither the magnitude of the injury nor the nature of the injury is important in this determination. See, United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689, 93 S.Ct. 2405, 2416-17, 37 L.Ed.2d 254 (1973). All that is required is a direct stake in the litigation. Id. With the filing of the Declarations of Mr. Mullen and Mr. Sharpley, the Court agrees that CEC has made a sufficient showing of standing in this case.

INJUNCTIVE RELIEF

A. Standard of Review
The parties here agree as to the proper standard for the granting of injunctive relief. Before the Court may grant the injunctive relief requested, the plaintiff must carry its burden to show:
a. a substantial likelihood of prevailing on the merits;

*1251 b. a substantial threat of irreparable harm if the injunction is not granted;
c. that the threatened injury outweighs the potential harm to the defendants; and
d. that the injunction will not undermine the public interest.
Lundgrin v. Claytor, 619 F.2d 61 (10th Cir. 1980). When the last three requirements are met, a movant may satisfy the likelihood of success on the merits requirement by raising serious questions going to the merits. Tri-State Generation v. Shoshone River Power, Inc., 805 F.2d 351 (10th Cir.1986), citing Otero Savings & Loan Assoc. v. Federal Reserve Bank, 665 F.2d 275, 278 (10th Cir.1981).
In hearings upon motions for temporary or preliminary injunctive relief, the burden is upon the one requesting such relief to make a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought. The applicant has the additional burden of showing a right to the specific injunctive relief sought because of irreparable injury that will result if the injunction is not granted. There must exist a probable right and a probable danger.
Crowther v. Seaborg, 415 F.2d 437, 439 (10th Cir.1969).

B. FLPMA
Section 603(c) of FLPMA, codified at 43 U.S.C. § 1782(c), provides in relevant part:
(c) Status of lands during period of review and determination
During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as wilderness, subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976; Provided, That, in managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection. . . .
The proper analysis for § 603(c) of FLPMA is found in Sierra Club v. Hodel, 848 F.2d 1068, 1085 (10th Cir.1988). As noted by the IBLA in its opinion, two questions are really at the heart of CEC's position in this case. First, does § 603(c) require that all activity related to the lease on the WSA should be suspended pending final action by Congress as to the Demaree Canyon WSA? The answer here is that those who held existing mineral leases when FLPMA was enacted are exempt from the standard in § 603(c) that requires management of such leases in such as way as not to impair suitability for preservation as wilderness. SOR at 6; 135 IBLA 359.
The second issue concerns the road extension into the WSA, as described in 135 IBLA 358. Here, the portion of the right-of-way to the existing well was in use before October 21, 1976 and there is an existing right-of-way within the WSA to a point within .4 miles from the actual site of the drilling of the two proposed wells. All of the construction and improvement is to occur within the leased land. Sierra Club v. Hodel recognized the valid existing right ("VER") status that a Utah county had in a county road through a WSA.
However, the lessee may not unnecessarily or unduly degrade a WSA. Under Interim Management Policy for Lands Under Wilderness Review, Chapter III, entitled Policies for Specific Activities, at A.3.b., new rights-of-way may be approved for temporary or permanent uses that do not satisfy the non-impairment criteria under certain conditions, including:
In cases of valid existing rights (VERs) where the BLM has determined that application of the nonimpairment standard would unreasonably interfere with the exercise of those rights. (Example of such a VER may include certain mineral leases. In each case, the BLMs [sic] decision will depend upon the nature of the rights conveyed and the site-specific conditions involved.)
*1252 In this case, CEC has failed to demonstrate that it was unreasonable for the BLM to allow NFC to continue to use the existing access road serving the producing well in order to more fully develop the lease within the WSA. The EA analyzed adequately the alternatives to continued lease development, including for example, suspension of operations, directional drilling, or the use of helicopters to reach the proposed drill site. The effect of development on the WSA was also analyzed. See e.g., Deputy Director Decision, at 3; 135 IBLA at 361. Five pages of mitigation measures were required by BLM which were subsequently challenged by CEC without describing what technology should have been considered instead. CEC failed to show that the required mitigation measures were not adequate at any time throughout the entire appeal process through the Deputy State Director to the IBLA to the instant action and appeal to the district court.

C. NEPA
Plaintiff has argued that the BLM has failed to comply with the requirements of the National Environmental Policy Act ("NEPA") in its finding of no significant impact ("FONSI"). The BLM concluded that the proposed activities of NFC on the lease in the WSA would have no significant impact and therefore, no EIS was required. In substance, plaintiff CEC contends that the BLM decision to approve NFC's proposed project is arbitrary and capricious, and a violation of NEPA precisely because of its decision not to prepare an EIS. This action is alleged to be the result of a failure to consider the appropriate factors required in order to reach an informed decision at the agency level. This Court disagrees.
NEPA's requirements are "essentially procedural"; as long as the agency's decision is "fully informed" and "well-considered," it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment.... Nevertheless, the court should "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a `hard look' at environmental factors, and to make a reasoned decision." ...
NEPA's requirement of a discussion of alternatives, therefore, should be superintended according to a "rule of reason." ... "[T]he concept of alternatives [under NEPA] must be bounded by some notion of feasibility." ... Thus, agencies are not required to consider alternatives that are "remote and speculative," ... but may deal with circumstances "as they exist and are likely to exist." . . .
Natural Resources Defense Council, Inc. v. Hodel, 865 F.2d 288, 294 (D.C.Cir.1988) (citations omitted).
In response to plaintiff's arguments, the BLM has urged this Court to find that the BLM has indeed taken a "hard look" at the impact of the proposed project on wilderness values, and that this decision is reflected in and achieved through the use of the "tiering" process, and is so reflected in the administrative record now before this Court for review. Under NEPA regulations, tiering is a process in which environmental impacts addressed in a previous EIS may be briefly summarized and incorporated by reference in a subsequent document. 40 C.F.R. § 1502.20, entitled "Tiering," provides:
Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of *1253 actions. (Section 1508.28).[1]
It is clear to this Court, upon a thorough review of the record, that tiering has occurred in this instance, in a manner consistent with the applicable regulations and agency policy. For example, in this case, on page 1 of the EA, the following is stated:
B. Conformance with Land Use and Plans and Policy
The Grand Junction Resource Management Plan (RMP) allows the development of oil and gas leases providing the proposal to develop conforms to the requirements of the RMP decisions, lease rights and lease stipulations. The entire project is located within the Demaree Wilderness Study Area (WSA), which was not recommended for inclusion in the wilderness system by BLM. The access to the proposed drilling site is located in Scenic and Natural Values (SNV) area and Important Seasonal Wildlife Habitat area for deer and elk as identified in the RMP. The lease within which the proposal would be constructed is a pre-FLPMA lease.
On page 5 of the EA, it is stated:
All new construction in the proposed alternative would take place entirely within the Demaree Wilderness Study Area. BLM did not recommend Demaree for inclusion in the wilderness system. The primary reason for the WSA not being recommended for wilderness was to maintain the potential for development of the high mineral values of coal and natural gas. Pre-FLPMA leases are not subject to the regulations created by FLPMA and the lease holders are allowed to develop their leases even if development impairs wilderness.
The Colorado Environmental Coalition disagrees with BLM's Demaree recommendation and has proposed that the area be considered by Congress for inclusion in the Wilderness System.
Again, page 10 of the EA reads in part as follows:
Cumulative impacts from oil and gas development in Demaree WSA were also discussed in the GJRA RMP and the GJD Final Wilderness EIS.
The Record of Decision also references the relevant prior documents. Exhibit 4, Plaintiff's Memorandum. Excerpts from the Record of Decision provide:
Rationale for Decision
1. Except as identified in 3 below all impacts can be adequately mitigated, and no significant impacts to other resources will result. The impacts identified in this environmental analysis are not considered to be undue or unnecessary.
2. Approval will allow immediate exploration for potentially valuable natural gas resources.
3. The proposal with mitigation does not conflict with other existing or proposed uses, and is consistent with the Grand Junction RMP, with the exception of the Wilderness Study Area and disturbance of an area with slopes in excess of 40%. The proposal will significantly alter the wilderness resource, however, the operator has a valid existing lease that grants the right to extract the oil and gas resource. The lease was issued January 1, 1970, prior to the passage of FLPMA and the signing of the RMP. Although the proposal has significant localized impacts *1254 to visual resources, the over all visual resource impact is minor.
4. The suspension of operations was not selected for approval due to the existing valid rights and the undue economic impact to the operator that an indefinite delay in approval of the APD's would cause. Also, as identified in # 3 above BLM did not recommend Demaree for wilderness designation in it's [sic] 1989 Wilderness EIS and it is unknown when Congress will make the decision on the Demaree's final wilderness status.
Plan Conformance
The decision to approve is in conformance with the existing Grand Junction Resource Area Resource Management Plan.
The decision of the Deputy State Director, Exhibit 5 to Plaintiff's Memorandum, also acknowledges the reliance on prior BLM analyses:
Cumulative impacts are discussed in the Resource Management Plan (RMP) for the area and in the EA. The impacts derived from the proposed wells are of the same kind and degree as analyzed in the RMP and consistent with those in nearby development.
Further recognition of the tiering principle and reliance on prior BLM studies is set forth in the IBLA opinion discussing CEC's appeal of the Deputy State Director's decision affirming the November, 1995 finding of no significant impact and record of decision by the Grand Junction Resource Area Manager. CEC argued on appeal, at the IBLA level, with respect to NEPA, as characterized in the IBLA opinion, that:
... the National Fuel development wells constitute a major Federal action significantly affecting the human environment so as to require preparation of an environmental impact statement (EIS) under 42 U.S.C. § 4332 (1994) (SOR at 8, 9). CEC argues that BLM's FONSI is mistaken because the EA does not show that unavoidable significant impacts will be mitigated (SOR at 11). It is contended that the EA fails to adequately address reasonably foreseeable indirect and cumulative impacts or impacts to wilderness, air, and wildlife. It is further contended that an attempt by the Deputy State Director to incorporate by reference parts of the Grand Junction Resource Area Management Plan dealing with such impacts is ineffective because that plan did not consider cumulative impacts of oil and gas leasing.
The Deputy State Director found that the EA identified and considered relevant matters of environmental concern; therein, indirect and cumulative impacts of road and well pad construction were considered in detail (EA at 10). The EA also incorporated by reference a 1989 Grand Junction Wilderness EIS, which contains an analysis of the environmental consequences of oil and gas management actions upon the Demaree WSA (EIS at 2-3, 2-11, 2-13, 3-3, 4-1 through 4-4). This sort of incorporation by reference (tiering) of relevant portions of an EIS by an EA is encouraged by regulations implementing NEPA. See 40 CFR 1508.28. Evaluating the environmental consequences of oil and gas development in the WSA, the EIS describes the effects upon the WSA of 15 leases, in addition to the National Fuel lease, that were issued prior to enactment of FLPMA; the EIS evaluates the effect of such lease development generally upon wildlife (EIS at 4-4) and wilderness (EIS at 2-13, 2-13, 3-3, 4-1) in the WSA. The EA deals more specifically with the National Fuel proposal, and considers the impact of the proposed two-well development upon wildlife (EA at 5, 8), water and air (EA at 6, 9) and wilderness (EA at 8, 9), among other matters not now being argued by CEC.
If an EA makes a careful review of relevant areas identified to be of environmental concern, and the resulting decision is reasonable, a FONSI based upon such analysis should be affirmed. Southern Utah Wilderness Alliance, 128 IBLA 52, 68 (1993). The record before us meets this test; it supports the Deputy State Director's decision to affirm BLM's finding that preparation of another EIS was not required for the proposed project. The NEPA arguments advanced by CEC, *1255 therefore, provide CEC no likelihood of success on appeal.
Plaintiff's Exhibit 6, Colorado Environmental Coalition, 135 IBLA at 361-362.
The Court finds that tiering, as discussed in 40 C.F.R. § 1502.20, did occur in this instance. Contrary to what CEC seemed to be arguing during the June 17 and 19 hearings before this Court, there is no notice requirement in order for an agency to be permitted to tier information reviewed in connection with a NEPA decision determining whether an EIS will be required. The documents were referenced in the EA and Record of Decision and were available for review by the public. Furthermore, the factual administrative record does not support CEC's arguments in this regard. It is clear that from as early as 1994, following submission of NFC's initial Application for Permit to Drill (APD) in September of 1994, CEC was notified of the proposed project, and was given and took advantage of opportunities to comment on the proposal. See e.g., Administrative Record, July 28, 1994 Notice of Proposed Activity in Areas under Wilderness Review sent to CEC and others; August 26, 1994 letter N. Mullen of CEC to BLM commenting on NFC APD; February 14, 1995 letter to N. Mullen of CEC from Catherine Robertson; October 12, 1995 Mullen letter regarding draft EA; December 21, 1995 Mullen letter regarding EA.
The concerns addressed in this correspondence indicate clearly that CEC was fully aware of the contents of the 1985 GJRMP/EIS as well as the 1989 Wilderness EIS. No obstruction to providing information to the public existed; there is no suggestion that CEC or others did not have opportunities to comment on the proposed action in a timely fashion or to participate in the decisionmaking process through the administrative level concerning the NFC proposed project within the Demaree Canyon WSA. The administrative record is replete with evidence that the agency considered relevant factors in making its ultimate FONSI decision and finding no requirement for preparation of a new EIS. Upon a review of the materials that have been submitted by the parties, this Court is unable to find that the agency's decision was not a reasoned decision and that the public was not permitted to comment and participate in the process.
Additionally, each of the documents relating to the agency's decision not to perform an EIS must be reviewed by this Court according to a "rule of reason" and notions of feasibility and must deal with circumstances "as they exist and are likely to exist." This Court finds and concludes that the goal of NEPA, i.e., assuring that the agency's decision is "fully informed" and "well-considered," and that "the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a `hard look' at environmental factors, and to make a reasoned decision," has been fulfilled in this instance. Natural Resources Defense Council, Inc. v. Hodel, 865 F.2d at 294.
Under any of the standards enunciated above, including the arbitrary and capricious administrative review standard or the NEPA reasonableness standard, this Court believes the record is sufficient to support the BLM's decision to permit the NFC proposed project to proceed in the Demaree Canyon WSA. The Court finds that the agency did not act in an arbitrary and capricious manner, did not abuse its discretion and acted in accordance to law. The agency's decision is entitled to deference and this Court is not in a position to second-guess its decisions. Plaintiff has failed, therefore, to carry its burden of showing that it is entitled to injunctive relief in that it has not prevailed on the merits.
Because these determinations are dispositive, the Court declines to address other issues that have been raised in these proceedings, including whether Section 706 of the Administrative Procedures Act provides for an independent cause of action. Additionally, this Court need not and will not consider the takings issues raised by the defendant BLM. The IBLA decision shall be affirmed in its entirety and the plaintiff's request for injunctive relief shall be denied. Accordingly, and in accordance with the Court's oral findings and rulings from the bench at the hearing, as enumerated more *1256 fully on the record of the hearing, it is therefore
ORDERED that the IBLA decision, Colorado Environmental Coalition, 135 IBLA 356 (June 5, 1996), shall be, and is, AFFIRMED IN ITS ENTIRETY. It is further
ORDERED that plaintiff CEC's Motion for Injunctive Relief shall be, and is, DENIED. It is further
ORDERED that the temporary restraining order issued June 17, 1996 shall be, and is, DISSOLVED.

JUDGMENT
This action came before the Court upon the motion of the plaintiff seeking injunctive relief and appealing the IBLA decision, Colorado Environmental Coalition, 135 IBLA 356 (June 5, 1996). The Court found that there the plaintiff's motion for injunctive relief should be denied, and that the IBLA decision should be affirmed in its entirety, as set forth in the Court's Memorandum Opinion and Order. It is therefore
ORDERED AND ADJUDGED that the plaintiff, Colorado Environmental Coalition, recover nothing of defendant, the Bureau of Land Management, and the Intervenor, National Fuels Corporation, and that judgment be, and hereby is, entered in favor of defendant, the Bureau of Land Management, and the Intervenor, National Fuels Corporation.
NOTES
[1] 40 C.F.R. § 1508.28, also entitled "Tiering," provides:

Tiering refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:
(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.
(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.